## Hunneman Real Estate Corporation *vs.* The Norwood Realty, Inc., & others.[1]

No. 98-P-2256.

Suffolk. March 15, 2001. - April 9, 2002.

Present: Jacobs, Cypher, & McHugh, JJ.

*Contract,* Construction of contract, Offer and acceptance, Misrepresentation, Implied covenant of good faith and fair dealing, Interference with contractual relations. *Sale,* Contract of sale. *Consumer Protection Act,* Sale of commercial property.

A letter of intent between two real estate brokerage firms regarding the purchase of the assets of one of the firms by the other presented a genuine issue of fact whether it bound the signatories to perform their recited obligations, and therefore, the judge in a civil action erred in granting the defendants' motion for summary judgment [419-424]; for the same reason, the judge erred in granting summary judgment on the plaintiff's claim for express and implied covenants of good faith [425].

The judge in a civil action properly dismissed a claim requesting that the defendants be estopped from denying that a binding contract existed between the defendants and the plaintiff, where the plaintiff's claim set forth nothing more than a claim for detrimental reliance based on misrepresentation, which duplicated another claim dismissed by the judge. [425]

A claim that civil defendants tortiously interfered with the contractual relationship between the plaintiff and the defendants was without merit as a matter of law, where the claim alleged that the defendants interfered with their own affairs, an activity which carries no liability. [425]

The judge in a civil action properly granted summary judgment on a claim for intentional interference with a contract, where the plaintiff failed to demonstrate that the defendants' interference involved the use of improper means or was based on improper motives. [426-429]

In a civil action arising out of the failed attempt by one real estate brokerage firm to purchase the assets of another, the judge properly granted summary judgment on a claim that the defendants violated G. L. c. 93A, § 11, by inducing the purchasees to break their agreement with the plaintiff and by misrepresenting the defendants' interest in acquiring the firm, where there

---

[1]Robert S. Phillips; Rose Marie Phillips; Better Homes & Gardens Real Estate Service, a Division of Meredith Corp.; Richard W. Carlson; Jean W. Carlson; Eastern Massachusetts Real Estate, Inc.; and EMRE of New Hampshire Corp.

was no commercial transaction between the plaintiff and the defendants, where § 11 did not apply to a party competing for a business advantage who was made aware that another had been exerting himself to the same end, and where there was no evidence that the plaintiff suffered any actual damages as a result of the asserted misrepresentation. [429]

CIVIL ACTION commenced in the Superior Court Department on June 22, 1995.

The case was heard by *Patrick J. King*, J., on motions for summary judgment.

*John B. Harkavy* for the plaintiff.

*Robert J. Muldoon, Jr.* (*Kenneth D. Small* with him) for The Norwood Realty, Inc., & others.

*Daniel J. Murphy* for Richard W. Carlson & others.

*Lisa G. Arrowood* for Meredith Corporation.

JACOBS, J. This action derives from a failed attempt by the plaintiff (Hunneman) to acquire the assets of a real estate broker-age business owned and operated by the defendants, The Nor-wood Realty, Inc. (Norwood), and Robert S. Phillips and Rose Marie Phillips. Following that failure, Hunneman brought a multi-count complaint in the Superior Court essentially based upon an alleged breach of a letter of intent signed by it and those defendants on January 5, 1995.[2] The complaint also contained counts against the defendant Better Homes & Gardens Real Estate Service, a division of Meredith Corp. (Meredith), and the defendants comprising the Carlson group (Carlson), who ultimately acquired the Norwood assets, alleging violation of G. L. c. 93A (count XII) and interference with the advanta-geous business and contractual relations of Hunneman (count X), and seeking to establish a constructive trust with respect to Meredith and the Carlsons (count XI). The case is before us on Hunneman's appeal from summary judgment dismissing all of

[2]The specific counts against Norwood and the Phillipses are breach of contract (count I), misrepresentation (count II), breach of express and implied covenants of good faith and fair dealing (count III), violation of G. L. c. 93A (count IV), specific performance (count V), declaratory judgment (count VI), constructive trust and preliminary injunction (count VIII), and estoppel (count IX). A separate count also accused the Phillipses of interference with advantageous and contractual relations between Hunneman and Norwood (count VII).

its claims against Meredith and Carlson and most of its claims against Norwood and the Phillipses.[3]

I. *Claims Against Norwood and the Phillipses.*

A. *Factual background.* The following facts relate primarily to the years 1994 and 1995. The Phillipses were the sole stockholders and chief executive officers of Norwood, which operated a real estate brokerage firm with offices in southern New Hampshire and Maine. Hunneman, a franchisee of Coldwell Banker, operated a similar business with offices throughout central and eastern Massachusetts. Carlson conducted a business in eastern Massachusetts as a franchisee of Meredith.

By September, 1994, Norwood had incurred debts in excess of $4 million, a majority of which had been personally guaranteed by the Phillipses. Those debts had been assigned to the Federal Deposit Insurance Corporation (FDIC) which, through its asset manager, was exerting pressure on the Phillipses to sell the assets of Norwood in order to satisfy their financial obligations and avoid bankruptcy. Hunneman, aware of those pressures, had been negotiating with the Phillipses to purchase the assets. The negotiations culminated with Hunneman, Norwood, and the Phillipses signing a letter of intent dated January 5, 1995, and setting an asset purchase price at $500,000. The letter made provision for the signing of a purchase and sale agreement and an "outside closing date" of February 15, 1995.

The outside closing date passed without a signed or tendered purchase and sale agreement.[4] A letter dated February 24, 1995, and two earlier versions, purporting to amend the letter of intent, were prepared by counsel for Norwood and the Phillipses and

---

[3]The count for misrepresentation (II) and so much of the c. 93A count (IV) as alleged misrepresentation against Norwood and the Phillipses survived the defendants' motions for summary judgment. Those claims later were dismissed on Hunneman's motion prior to the entry of judgment and are not before us.

[4]In its brief, Hunneman asserts it exercised its right to extend the February 15, 1995, closing date, citing a February 14, 1995, letter from its attorney to counsel for Norwood and the Phillipses which stated, "Hunneman remains ready, willing and able to close the Transaction within seven to fourteen days, consistent with the terms and schedules agreed to in our February 13th telephone conversation. . . . Hunneman remains committed to close the Transaction, consistent with the terms of the Letter of Intent, subject to the Hunneman loan offer . . . ." The referenced loan offer was in the amount of

forwarded to Hunneman. The letter, dated February 24, 1995, was signed by Hunneman and returned to Norwood's counsel. The proposed amendment increased the transaction purchase price to $675,000.[5] Neither Norwood nor the Phillipses signed that letter, and the Hunneman-Norwood transaction was never completed. Instead, on March 17, 1995, Norwood sold its assets to a member of the Carlson group for $675,000.

B. *Enforceability of the letter of intent (count I).* The central issue is whether the letter of intent presented a genuine issue whether it bound the signatories to perform their recited obligations or whether it was, as determined by the judge, "merely an agreement to agree" and, therefore, not enforceable as matter of law. See *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 217 (1935) ("An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto"). The question calls for close examination of the letter. Running eleven single-spaced typed pages, it expressly addresses fifteen discrete substantive topics.[6] The last numbered clause provides for the preparation of a "full purchase and sale agreement to be signed at or before closing which will contain the terms hereof and such additional terms as are normal in a purchase and sale agreement for the purchase of assets." The closing was scheduled to occur "on or before February 1, 1995 or a date not later than ten (10) days following approval by the FDIC . . . of the transfer of assets . . . (with an outside closing date of February 15, 1995, unless otherwise extended by [Hunneman])." In addition to being identified in ten detailed paragraphs, the assets to be purchased are described as es-

---

$175,000 which, according to the same letter, was "the additional amount reportedly required by the FDIC to close the Transaction."

[5]The change in purchase price was offset by an adjustment in certain non-compete payout provisions. The amendment also essentially set forth lease terms left unresolved by the letter of intent. See section I.B., *infra.*

[6]The topics are headed as follows: "1. Assets to be Purchased" [the assets were set forth in ten paragraphs describing various tangible and intangible property, business systems and rights]; "2. Purchase Price"; "3. Covenants Not To Compete"; "4. Employment Agreements"; "5. Medical Insurance"; "6. Company Benefits"; "7. Referral Fees"; "8. Payments Under Existing Purchase and Sale Agreements"; "9. Commercial Real Estate Business"; "10. Relocation Business"; "11. Closing"; "12. Contingencies"; "13. Employees"; "14. Professional Liability Insurance"; and "15. Purchase and Sale Agreement."

sentially "[a]ll of the assets" of Norwood "including, without limitation," the furniture, fixtures, and equipment of its offices at twelve specified New Hampshire locations,[7] and the purchase price is set forth as "$500,000 cash." On their part, the Phillipses agreed to enter into covenants not to compete within certain defined time and geographic limits for which Hunneman agreed to pay up to $2 million over an eight-year period following the closing, "based on a percentage of the total residential real estate business done by [Hunneman's] New Hampshire offices," including the offices acquired from Norwood. Formulae for the computation of the pay-out are included. The letter also contains specific provisions for the employment of the Phillipses, their salaries ($75,000 per year) and company benefits.

The initial paragraph of the letter states: "This letter of intent sets forth a binding agreement . . . to enter into a full Purchase & Sale Agreement and complete the transactions contemplated by this letter of intent, subject only to any contingencies which may be set forth herein." The last paragraph similarly states, "[T]his is a binding letter of intent and the parties hereto intend to negotiate the full purchase and sale agreement and consummate the agreements contemplated herein in good faith in accordance with the time period set forth."[8]

The major contingencies described by the letter of intent are (1) a provision in the paragraph entitled "Contingencies"[9] in effect reserving to Norwood and the Phillipses "the right to negotiate" a settlement of the secured debt owed to the FDIC so as to permit delivery of the Norwood assets "free and clear

---

[7]The letter of intent also specified certain tangible and intangible property and included "[a]ll unspecified property used and useful in the conduct of the real estate business." A final schedule of assets was to be prepared prior to the closing.

[8]The quoted words stand in stark contrast to the language recommended by our courts to parties who do not intend to be bound by a preliminary agreement. See McCarthy v. Tobin, 44 Mass. App. Ct. 274, 279 n.10 (1998), S.C., 429 Mass. 84, 88 n.3 (1999), citing Goren v. Royal Invs., Inc., 25 Mass. App. Ct. 137, 142-143 (1987).

[9]The other described contingencies are that the assets be delivered free and clear of all encumbrances and that Hunneman obtain a license agreement from Coldwell Banker for the offices being acquired and be given an opportunity to review Norwood's financial statements and to verify its schedules of assets. The license from Coldwell Banker was acquired on January 17, 1995.

of all encumbrances." Such settlement was to be "in the sole discretion" of Norwood and the Phillipses "acting in good faith," but failure to achieve settlement would not be considered a "default" by them; and (2) a separate provision in a subsection to the "assets to be purchased" provision that "[i]t shall be a closing condition that the parties enter mutually satisfactory leases" for three of the Norwood offices, which were located in property owned by the Phillipses in New Hampshire. That subsection also provides for the assignment to Hunneman of the existing leases of Norwood's other offices.

The most recent pronouncements in our cases on the subject of the enforceability of precontractual agreements place great reliance on the intention of the parties. *McCarthy* v. *Tobin*, 429 Mass. 84, 87 (1999) ("The controlling fact is the intention of the parties"). See *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000), citing *David J. Tierney, Jr., Inc.* v. *T. Wellington Carpets, Inc.*, 8 Mass. App. Ct. 237, 241 (1979), for the proposition that a "party to [a] contract may be found to have entered [a] binding agreement if [that] party intended to be presently bound." Here, the intent of the parties to be bound by the letter of intent is not left to inference from the terms of their agreement but is twice expressly stated in prominent parts of the letter of intent. Where intention is clearly stated or evident, the analytical focus generally turns to whether the inchoate or unresolved aspects of the parties' agreement are "essential" or "material." "It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement. . . . It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." *Situation Mgmt. Sys. Inc.* v. *Malouf, Inc.*, *supra* at 878. (Citations omitted.)

The primary "contingency" set out in the letter of intent and argued by Norwood as being a major unresolved and material term is the provision recognizing the obligation of Norwood to deliver its assets "free and clear of all encumbrances" and reserving to Norwood and the Phillipses the right to negotiate

the settlement of the FDIC debt. The further provision that the failure of Norwood and the Phillipses to achieve settlement "shall not be a default by [them] under this agreement," unmistakably reflected the reality, borne out by the record, that a final debt settlement with FDIC had not been reached. At that time, the transaction was infected by a sense of increasing urgency fueled by the threat to and by the Phillipses of personal bankruptcy and their attempt to salvage a future income stream from the sale of Norwood.[10] The settlement, however, was not a condition to the formation of the agreement or the signing of the contemplated purchase and sale agreement. Rather, it was in the nature of a condition subsequent attached to a binding agreement that excuses a party from its contractual obligations thereunder. See *Wood* v. *Roy Lapidus, Inc.*, 10 Mass. App. Ct. 761, 764 n.6 (1980); *Yiakas* v. *Savoy*, 26 Mass. App. Ct. 310, 313-314 (1988). "[I]f the matter [to which the obligation is subject] is some event or some act of a third person, the parties may now be bound irrevocably, though their obligation may be a conditional one." 1 Corbin, Contracts § 2.9, at 154 (rev. ed. 1993). The corollary to this view is that if a settlement were obtained, the agreement of the parties, rather than then coming into existence, would simply continue to be binding. *Nigro* v. *Conti*, 319 Mass. 480, 482 (1946). *Haverhill* v. *George Brox, Inc.*, 47 Mass. App. Ct. 717, 719-720 (1999). Also, the use of the word "default" underscores the parties' belief that the "binding" agreement acknowledged in the first and last paragraphs of the letter of intent would not first come into existence upon settlement with the FDIC, but rather that failure to settle would discharge the obligations of Norwood and the Phillipses. It would be no small irony if a provision whose obvious objective

---

[10]On January 17, 1995, the Phillipses made a settlement offer to the FDIC of $107,000 of their personal funds, plus the $500,000 proceeds of the Norwood asset sale together with one hundred percent and fifty percent, respectively, of the anticipated first and second year noncompete payments. Shortly thereafter, this offer was rejected by the FDIC. By separate letters dated February 8, 1995, the Phillipses and their counsel notified Hunneman and its counsel that the FDIC had requested an additional cash payment of $175,000. In a February 22, 1995, cover letter enclosing a proposed amendment to the letter of intent, counsel for Norwood and the Phillipses informed Hunneman's counsel that the FDIC had sent out demand letters on all the notes and guarantees.

was to protect Norwood and the Phillipses from liability for their breach of the contract were to be used to establish the absence of that contract.

Provision for the execution of a more formal document such as a purchase and sale agreement is not conclusive. Compare *Coan* v. *Holbrook*, 327 Mass. 221, 224 (1951), quoting from Restatement of Contracts § 26 (1932) ("Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . ."), with *Rosenfield* v. *United States Trust Co.*, 290 Mass. 210, 216 (1935) ("Normally the fact that parties contemplate the execution of a final written agreement justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled"). That the letter of intent looked to the parties' respective attorneys to prepare a purchase and sale agreement containing "such additional terms as are normal" to an asset purchase and which could be signed as late as the closing of the transaction, smacks more of formality and legal boilerplate than a call for further negotiation of material terms. "Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties." *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 518 n.9 (1998), quoting from *Teachers Ins. Annuity Assn.* v. *Tribune Co.*, 670 F. Supp. 491, 497-498 (S.D.N.Y. 1987) (Leval, J.).

Even if the "closing condition" relating to the leasing of the three offices owned by the Phillipses is treated either as not resolved by the proposed letter of amendment drafted by Norwood's counsel and dated February 24, 1995,[11] or as not susceptible to formulaic resolution utilizing available norms in

---

[11] "The subsequent conduct and interpretation of the parties themselves may be decisive of the question as to whether a contract has been made, even

the form of relevant market rates[12] and the lease terms of the other Norwood offices being acquired, it cannot be said, as matter of law, that the three leases to be negotiated represented an essential aspect of the transaction. Given the breadth and complexity of the central objective driving the transaction — the quick transfer of Norwood's entire real estate business to Hunneman and the provision of substantial future income to the Phillipses — the question of the importance, materiality, and severability of any unresolved lease issues relating to the three offices owned by the Phillipses is a genuine issue of material fact unsuitable for determination by summary judgment.

Norwood's argument that fundamental issues relating to the employment of the Phillipses were unresolved seems belied by the provisions of the letter of intent (1) setting out the periods of employment (two years), the salary ($75,000), and other conditions of employment for each of the Phillipses; (2) detailing the medical insurance coverage to be afforded (up to eight years); and (3) indicating that the Phillipses, while employed, would be accorded such benefits "as are customary for employees at the vice presidential level." At a minimum, these statements also establish that the issue of whether the letter of intent is unenforceable due to vagueness of the employment provision is unsuitable for determination by summary judgment.

The question before us is not whether the parties to the letter of intent were, in a commercial sense, "merely hugging or engaged to be married," *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 394 (1991), *S.C.*, 412 Mass. 703 (1992), but rather if there is a genuine issue whether the letter incorporates in a binding manner all the essential terms of the contemplated transaction. The submissions under Mass.R.Civ.P. 56, 365 Mass. 824 (1974), viewed contextually, and with an indulgence in Hunneman's favor, see *Conley* v. *Massachusetts Bay Transp. Authy.*, 405 Mass. 168, 173 (1989), demonstrate that such an issue exists.

though a document was contemplated and has never been executed." 1 Corbin, Contracts § 2.9, at 154. See *Novel Iron Works, Inc.* v. *Wexler Constr. Co.*, 26 Mass. App. Ct. 401, 408-410 (1988).

[12]That market rates were contemplated is confirmed by draft amendments of the letter of intent forwarded to Hunneman by Norwood's counsel.

## C. *Other Issues.*[13]

1. *Estoppel (count IX).* Hunneman's count requesting that Norwood and the Phillipses be estopped from denying that there is a binding contract is based on the alleged misrepresentations of their intent to sell to Hunneman. As such, the count is overdrawn in the sense that any such misrepresentation is not related directly to the central issue whether the letter of intent is sufficiently comprehensive with respect to all essential matters to be enforceable. Moreover, Hunneman, in this count, describes its damages as based on its due diligence expenses and not on traditional benefit of the bargain contract damages. We, therefore, read this count as setting forth nothing more than a detrimental reliance claim based on misrepresentation, and duplicating the misrepresentation claim in count II, which was dismissed in the Superior Court. See note 3, *supra.*

2. *Covenant of good faith (count III).* Given our decision on Hunneman's contract claim, its count for breach of express[14] and implied covenants of good faith may also proceed to trial. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471-473 (1991).

3. *Interference claims against the Phillipses (count VII).* Hunneman's claim that the Phillipses tortiously interfered with the relationship between Hunneman and Norwood is without merit, as matter of law. Not only were the Phillipses the sole stockholders and chief executive officers of Norwood, but they also were the direct and principal potential beneficiaries of the letter of intent to which they were party. Hunneman's claim, therefore, is "subject to the embarrassment" that it essentially alleged that the Phillipses interfered with their own affairs, an activity which carries no liability. *Saint Louis* v. *Baystate Med. Center, Inc.*, 30 Mass. App. Ct. 393, 404 (1991). See *Schinkel* v. *Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41, 50 (1991).

[13]To the extent that Hunneman has appealed from summary judgment relative to certain counts in its complaint and has not briefed any argument with respect thereto, such appeal is deemed waived. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

[14]The express covenant to "negotiate the full purchase and sale agreement and consummate the agreements contemplated" in the letter of intent is not qualified by a disclaimer as was that in *Schwanbeck* v. *Federal-Mogul Corp.*, 412 Mass. at 705 n.2, 706-707.

## II. *Claims Against Meredith and Carlson.*

A. *Factual background.* In the years prior to the events giving rise to this litigation, Coldwell Banker, a franchisor of Hunneman, and Meredith, a franchisor of Carlson, were involved in intense competition for additional franchises and real estate brokerage business. During the early 1990's, both Carlson and Hunneman had attempted to acquire or affiliate with Norwood. Shortly after he signed the letter of intent with Hunneman, Robert S. Phillips telephoned Allen Sabbag, a chief official of Meredith, and informed him of the letter, at the same time indicating that he was uneasy about Hunneman's ability to complete the transaction. He also asked whether Meredith would be interested in acquiring Norwood. After telling Phillips that he would be interested, Sabbag notified Carlson of the conversation. On January 15 and January 22, 1995, Carlson met with Phillips and discussed making a back-up offer. On February 6, 1995, Phillips informed Carlson that he needed $675,000 to satisfy the FDIC agent. On February 7, 1995, Sabbag told Phillips that Meredith would back up Carlson. By letter to the Phillipses dated February 8, 1995, Carlson stated that Carlson and Meredith would be "prepared to pay" $675,000 for Norwood "plus an earn out and employment contracts to be determined." The Carlson letter also stated, "It is clearly understood that this is to be considered a back-up offer; and, in the event you are unsuccessful in completing your negotiations, we are prepared to step forward immediately." Following execution of a letter of intent in late February, Carlson, Norwood, and the Phillipses, on March 10, 1995, signed a comprehensive agreement for the purchase and sale of the Norwood assets for $675,000,[15] and on March 17, 1995, the transaction was closed with FDIC approval.[16]

B. *Improper interference (count X).* In *United Truck Leasing*

---

[15]The asset purchase agreement between Carlson, Norwood, and the Phillipses, dated March 10, 1995, indicates that the Phillipses were to enter into "annexed" employment and noncompete agreements with Carlson. Our record does not contain those agreements.

[16]The FDIC, on March 14, 1995, notified Norwood that it would accept $782,000 in full settlement of the Norwood/Phillips debt. We assume that amount was paid with the proceeds of the asset sale ($675,000) and the same $107,000 in personal funds offered on January 17, 1995. See note 10, *supra.*

*Corp.* v. *Geltman*, 406 Mass. 811 (1990), the Supreme Judicial Court made clear that a plaintiff in an action for intentional interference with a contract must prove "something more" than that the defendant knowingly induced a third party to break its contract with the plaintiff and that the plaintiff was harmed thereby. *Id.* at 812. The additional element to be proved is that the interference involved the use of improper means or was based on improper motives. For analytical purposes, whether the letter of intent is enforceable or merely an agreement to agree is of no consequence because improper conduct, beyond the interference itself, is "an element both in the proof of intentional interference with performance of a contract . . . and in the proof of intentional interference with a prospective contractual relationship." *Id.* at 816.

1. *Improper means.* Relying on the deposition of its chief executive officer, Stuart Pratt, Hunneman argues that Meredith violated the improper means test on February 1, 1995, when Sabbag represented to Pratt that Meredith had no interest in purchasing Norwood. Although Sabbag may have had no duty to disclose his company's competitive interest in Norwood, see *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 696 (1986), it is arguable that even the rough and tumble standards of commercial competition do not excuse outright misrepresentation. Nevertheless, the overriding fact is that Sabbag's statement was directed at Hunneman and not Norwood and the Phillipses. It did not induce or otherwise cause Norwood to violate any of its contractual obligations. See Restatement (Second) of Torts § 766 (1979). Similarly, the statement did not "induc[e] or otherwise caus[e] [Norwood] not to enter into or continue the prospective relation" with Hunneman. *Id.* at § 766B(a). Moreover, Hunneman did not present any evidence that it was harmed or impeded in its negotiations or performance by the statement.[17] See *id.* at § 766A; *United Truck Leasing Corp.* v. *Geltman*, 406 Mass. at 816 n.8. As matter of law, therefore,

---

[17]The record indicates that Hunneman may have been aware, prior to Sabbag's statement to Pratt, that Norwood was not dealing exclusively with it. Robert S. Phillips stated in his deposition that he believed Norwood's attorney informed Hunneman's attorney in January, 1995, that Norwood was exploring "other options" in the form of "potential suitors for the purchase of Norwood."

Meredith did not use "improper means" as that term applies to tortious interference.[18]

2. *Improper motives.* Statements and behavior cited by Hunneman in support of its claim of improper motive are insufficient to avoid summary judgment.

(a) Caustic and sophomoric remarks by Sabbag directed at Pratt during a break in a deposition in this action are irrelevant to the issue of Meredith's prelitigation motivation. The remarks, not addressed to any issue or event germane to the litigation, and merely reflecting the anger and ill will that regrettably often attend deposition practice, do not inform our summary judgment analysis as to Meredith. Cf. *Symmons* v. *O'Keefe*, 419 Mass. 288, 296 (1995) ("The record does not support any claim of hostility toward the plaintiffs other than that resulting from this litigation").

(b) Conclusory descriptions of a Carlson official's nonspecific general behavior toward a Hunneman official as being "less than cordial" and reflecting "bad blood" are not sufficient to create a genuine issue with respect to Carlson's motivation in acquiring Norwood. "There is not enough evidence to warrant a finding that [Meredith's or Carlson's] real motive in these matters was to hurt [Hunneman]." *United Truck Leasing Corp.* v. *Geltman, supra* at 817. Contrast *Draghetti* v. *Chmielewski*, 416 Mass. 808, 817 (1994) (a history of "strained relations" between a police officer and his chief of police together with evidence of a physical confrontation between them and severe disparate treatment of the officer by the chief was sufficient to demonstrate that the chief acted with improper motives in interfering with the officer's part-time employment at a police training academy). Even were we to view the remarks in question as reflecting ill will infecting the acquisition, there was ample evidence that Meredith's and Carlson's dominant purpose in the acquisition was to profit commercially and only incidentally to advance their competitive position with respect to Hunneman. See

---

[18]Hunneman's other claim to the effect that Meredith acted improperly when it authorized Carlson to increase its purchase offer from $500,000 to $675,000 is without merit, as that authorization was well within the ambit of ordinary and acceptable business activity and competition. See *W. Oliver Tripp Co.* v. *American Hoechst Corp.*, 34 Mass. App. Ct. 744, 752-753 (1993).

Restatement (Second) of Torts § 768(1)(d), and comment g, at 43 (1979) ("If [the interfering party's] conduct is directed, at least in part, to [advancing his competitive interest], the fact that he is also motivated by other impulses, as, for example, hatred or a desire for revenge is not alone sufficient to make his interference improper").

C. *Chapter 93A claim (count XII).* In its complaint Hunneman alleges that Meredith and Carlson violated G. L. c. 93A, § 11, by inducing Norwood and the Phillipses to break their agreement with it and by misrepresenting their interest in acquiring Norwood. At least three factors support the entry of summary judgment against Hunneman on this claim: (1) the absence of a commercial transaction between Hunneman and its competitors. *Szalla* v. *Locke,* 421 Mass. 448, 451 (1995). *Linkage Corp.* v. *Trustees of Boston Univ.,* 425 Mass. 1, 23, cert. denied, 522 U.S. 1015 (1997). (2) General Laws c. 93A, § 11, has not been extended to apply to "a party . . . competing for a business advantage because he is made aware that another has been exerting himself to the same end. That would be an extravagant rule of law." *Doliner* v. *Brown,* 21 Mass. App. Ct. at 698. (3) There is no evidence that Hunneman suffered any actual damages as a result of the asserted misrepresentation. *Warner-Lambert Co.* v. *Execuquest Corp.,* 427 Mass. 46, 48 (1998). Chapter 93A, § 11, does not require the award of minimum damages. Contrast G. L. c. 93A, § 9.

Insofar as the judgment dismissed count I (breach of contract) and count III (breach of covenant of good faith and fair dealing) against The Norwood Realty, Inc., Robert S. Phillips, and Rose Marie Phillips, it is vacated and those counts are remanded to the Superior Court. Insofar as the judgment dismissed counts V, VI,[19] VII, VIII, IX, X, XI, and XII, it is affirmed.

*So ordered.*

---

[19]Although the entry of judgment without a declaration of rights generally is inappropriate in a declaratory judgment action, *Mayor of Salem* v. *Warner Amex Cable Communications Inc.,* 392 Mass. 663, 669 (1984), Hunneman's request (count VI) for a declaration of its right to specific performance is moot and its request for a declaration that the Phillipses and Norwood are jointly and severally liable to it is subsumed in the damage demand of count I, which is remanded to the Superior Court.