Kaplan, Mitchell H., J.
Introduction
This case arises out of a dispute between the two owners of a dental practice. The plaintiff Dr. Bahrain Ghassemi-Taiy (Ghassemi) and the defendant Dr. Zhaleh Jolle Hami (Hami) each own half of the shares of the professional corporation (the Corporation) which is the subject of their dispute. Ghassemifiled this action on July 10, 2008 seeking to enforce an alleged agreement pursuant to which Hami agreed to purchase Ghassemi’s interest in the Corporation for a stated sum. Hami denies that she and Ghassemi entered into a binding agreement that the court may enforce. She has counterclaimed against Ghassemi asserting claims for: breach of contract, breach of fiduciary duty, misappropriation of profits, self-dealing, and unjust enrichment. Many of these counts arise out of Hami’s objection to the Corporation employing Ghassemi’s wife. This pleading prompted Ghassemi to file a counterclaim to Hami’s counterclaim (a pleading with which the court is not familiar) in which Ghassemi complained of the Corporation’s employing Hami’s daughter. The case came before the court for a juiywaived trial on October 11 and 12, 2012. Four witnesses testified and nineteen exhibits were entered in evidence. The parties requested and were given leave to file post-trial pleadings. In consideration of the testimony, exhibits and post-trial memoranda, the court makes the following findings of fact and conclusions of law.
FACTS
Ghassemi received his initial training in dentistry in Iran. He is an orthodontist. He has both a private practice and is an associate professor at Tufts University. Hami similarly received her initial training in Iran and also has graduate degrees from Boston University. She specializes in pediatric dentistry. Ghassemi and Hami have practiced together since at least 1991; Hami began her practice in Ghassemi’s basement. In 1991 they formed the Corporation, either after or connection with the acquisition of a retiring dentist’s practice, continuing that practice in offices located on Centre Street in West Roxbuiy.[1] The parties conducted a dental practice in that space until 2005, when they moved to larger offices just a few doors away on Centre Street. At the time of trial, they were still practicing in this Centre Street office.
At the time of incorporation, the parties executed a written agreement that set out the manner in which expenses would be shared and profits apportioned. It is not clear whether they ever actually operated their practice in conformity with that agreement. In any event, many years before the events giving rise to this action, they adopted a policy in which the Corporation paid all expenses and profits were shared equally. For reasons that were not well articulated, Hami was always an employee of the Corporation, while Ghassemi provided services as a contractor until a few years ago. Under this arrangement, Hami was paid a few thousand additional dollars each year. Both parties testified that this had something to do with reimbursing Hami for FICA payments, but the court was unable to understand how or why these payments to Hami were made.
While the practice was profitable, there appears to have been constant disagreement as to who was making the more significant contribution to its profitability. This was exacerbated by the fact that both Hami and Ghassemi had other professional money-generating activities and each worked only a few days a week for the Corporation in West Roxbuiy. By the time of trial, neither of them was present at the Centre Street offices when the other was there. An area of particular disagreement were the profits generated by the dental hygienist and whether those were fairly attributable to the Corporation or should be viewed as part of Hami’s distinct contribution. In any event, the parties continued their practice of sharing profits equally.
The disagreements became more focused and intense when the parties moved to their new offices. Their receptionist/administrative assistant left the practice at the time of that move, and Mrs. Ghassemi began to work there shortly thereafter. The parties’ testimony concerning how Mrs. Ghassemi came to be an employee of the Corporation and her compensation was set were inconsistent, but those inconsistencies need not be resolved to decide this case. The Corporation’s payroll was managed and paid by an independent payroll services firm, Practical Payroll. Hami approved the payroll checks issued to all employees, except her own, which was approved by Ghassemi. No payroll check would be issued without her approval. The director of Practical Payroll testified that two or three times within the last couple years, Hami told him that she did not agree with the payment being made to Mrs. Ghassemi, but she did not tell him not to issue the checks. It is clear that no checks would be cut for any employee without her approval. This point is underscored by the fact that in August 2006, Hami refused to authorize a payroll check for two weeks of paid vacation for Mrs. Ghassemi and Practical Payroll did not issue that check. The parties’ dispute about this vacation pay is discussed below.
By 2006, the parties’ disagreements had escalated. Hami believed that she was contributing more than fifty percent of the revenues, generated less than fifty-percent of the expenses, and it was inequitable to divide the profits equally to her and Ghassemi. She was also upset by the amount of Mrs. Ghassemi’s pay. In June 2006, Hami confronted Ghassemi about a reallocation of profits, but Ghassemi rejected her proposal. By August, the parties were discussing methods *524 to separate their practices. Hami suggested that they share rent and utilities, but run the practices separately. Ghassemi suggested that either party buy the other’s share in the Corporation. These discussions did not bring about a resolution of their differences.
In August 2006, a dispute erupted concerning Mrs. Ghassemi’s pay. Ghassemi wanted his wife to be paid for two weeks of vacation. Hami maintained that she had already taken too much paid vacation that year and directed Practical Payroll not to issue Mrs. Ghassemi a check. That prompted Ghassemi to write his wife a check from the Corporation’s account in the amount of $726.91, an amount equal to Mrs. Ghassemi’s net pay for the two-week period, without Hami’s approval.
Relations further deteriorated. Between January and March 2007, Ghassemi deposited into his own accounts two checks received from the Commonwealth for services he rendered to MassHealth insured patients, in the amounts of $8,392 and $5,380, respectively, that belonged to the Corporation. He also wrote himself a check from the Corporation’s account for $5,000, without Hami’s knowledge. At trial, Ghassemi testified that he was using self-help to address the payments made to Hami but not him several years earlier (having something to do with FICA, see supra) while she was an employee of the Corporation and he was not. In February 2007, the parties tried to negotiate a separation with the assistance of the Corporation’s accountant, sealed bids for the practice were discussed, but the efforts were unsuccessful. In April, the parties had their last face-to-face meeting to discuss a resolution of their differences, but that failed as well.[2] At that point, Hami retained counsel.
On May 25, 2007, Hami’s lawyer wrote to Ghassemi complaining of his conduct and “demanding binding arbitration of all unresolved matters concerning management of the practice.” The letter did not state the source for Ghassemi’s obligation to submit the disputes to arbitration. Ghassemi retained counsel as well, and counsel exchanged correspondence through the summer and into the fall. In particular, on September 26, 2007, Hami’s attorney wrote to Ghassemi’s attorney that Hami “would like to remind your client, Dr. Ghassemi, that she has repeatedly stated that she is not willing to sell her share of the practice. However, she welcomes Dr. Ghassemi to offer a price for the sale of his share of the practice and she will decide if she can buy his share.”
On October 15, 2007, Ghassemi’s attorney wrote back to Hami’s counsel. He offered three alternative approaches to a resolution: a buy/sell agreement; an appraisal followed by open bidding or sealed bids; or a sale of assets and dissolution of the Corporation. With respect to the buy/sell, the letter stated: “Dr. Ghassemi proposes to either purchase from or sell to Dr. Hami their respective interests in the sum of $400,000.” By letter dated December 4, 2007, Hami’s attorney responded. His letter reads as follows:
Please consider this letter as an acceptance of your client’s offer to sell his interest in the above-reference practice of the sum of $400,000 pursuant to you letter of October 15, 2007. This acceptance is subject only to the assent of the landlord to the assignment of the lease and the execution of a mutually acceptable purchase and sale agreement.
Please note that Dr. Hami would like to offer Dr. Ghassemi-Tary (or his daughter Dr. Sara Ghassemi after she graduates from orthodontic school) the option to stay on as the in-house orthodontist for the practice at mutually acceptable terms.
Please let me know if you would prefer me to put together the first draft of the purchase and sale agreement. I look forward to hearing from you.[3]
Shortly thereafter, Ghassemi called Hami and congratulated her on purchasing the practice. They did not have any other substantive discussions concerning the transaction. In particular, Hami gave no indication that her agreement to purchase the practice was conditional or contingent on anything. Nonetheless, on January 4, 2008, her attorney wrote to Ghassemi’s lawyer as follows: “After much thought my client has decided that it would be better for all concerned that she sell her interest in the practice rather than buy. Therefore, she is willing to sell all of her stock in the corporation, including her allocable interest in all accounts receivable as of January 4, 2008 for the sum of $538,000 with a proposed closing date of January 31, 2008.”
Ghassemi maintains that Hami’s rejection came too late, as her December 4, 2007 letter was an unconditional acceptance of Ghassemi’s offer to sell his interest in the Corporation to her for $400,000. Hami maintains that there are too many unresolved and open issues, such as a non-competition provision, closing date, transition period, and indemnification for the correspondence to establish a contractual obligation. Therefore, no binding agreement was created by the December 4th letter. Although Ghassemi filed the instant action, the parties continue to practice together, albeit under an arrangement where they are apparently never both in the West Roxbuiy offices at the same time.
DISCUSSION
Ghassemi’s Claim
The central question of law presented by this case is whether the exchange of letters between the parties’ attorneys created a binding agreement on the part of Hami to purchase Ghassemi’s interest in the Corporation. In Hunneman Real Estate Corporation v. Norwood Realty, Inc., 54 Mass.App.Ct. 416, 421 (2002), the Appeals Court reviewed the law concerning this issue:
The most recent pronouncements in our cases on the subject of the enforceability of precontractual agreements place great reliance on the intention of the parties. McCarthy v. Tobin, 429 Mass. 84, 87 (1999) (“The controlling fact is the intention of the parties”). See Situation Mgmt Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000), citing David J. Tierney, Jr., Inc. v. T. Wellington Carpets, Inc., 8 Mass.App.Ct. 237, 241 *525 (1979), for the proposition that a “party to [a] contract may be found to have entered [a] binding agreement if [that] party intended to be presently bound.” . . . Where intention is clearly stated or evident, the analytical focus generally turns to whether the inchoate or unresolved aspects of the parties’ agreement are “essential” or “material.” “It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement... It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract.” Situation Mgmt Sys. Inc. v. Malouf, Inc., supra at 878. (Citations omitted.)
In this case, the intention of the parties to enter into a binding agreement through their correspondence is manifest. The parties had intractable disagreements concerning the Corporation and their respective contributions and compensation and had been trying to reach an agreement to separate their practices for nearly two years, by the time these letters were exchanged. On September 26th, Hami wrote to Ghassemi that she had no interest in selling her share of the Corporation to Ghassemi, but asked Ghassemi to make an offer to sell her his shares, and she would decide whether to accept it. He wrote back and offered either to sell his shares to Hami or purchase her shares from her for $400,000, using classic buy/sell language, often thought to be characteristic of a purchase price that the offeror, in good faith, believes is fair because he is willing to be bound by either decision that the offeree may make. On December 4, 2007, Hami’s attorney responded on her behalf. His letter began: “Please consider this letter as an acceptance of your client’s offer to sell his interest in the ... practice for the sum of $400,000 . . . This acceptance is subject only to the assent of the landlord to the assignment of the lease and the execution of a mutually acceptable purchase and sale agreement.” The letter left no doubt that, after two years of squabbling, a deal between the two parties had been achieved. The court has no doubt that Hami would have considered Ghassemi bound to sell her his interests in the Corporation after his lawyer received this letter had she not changed her mind.
The reference to the assent of the landlord raises, at most, a condition subsequent to the enforcement of the parties’ contractual obligations to one another. See, Hunneman, 54 Mass.App.Ct. at 422, citing, Wood v. Roy Lapidus, Inc., 10 Mass.App.Ct. 761, 764 n.6 (1980); Wakas v. Savoy, 26 Mass.App.Ct. 310, 313-14 (1988). “(I]f the matter [to which the obligation is subject] is some event or some act of a third person, the parties may now be bound irrevocably, though their obligation may be a conditional one.” 1 Corbin, Contracts §2.9, at 154 (rev. ed. 1993). In this case, since Hami refused to take any action to consummate the deal, whether the landlord would assign the lease is unknown. In any event, as it is Hami who would like to be excused from her obligation under the agreement, she carries the burden of establishing the condition subsequent, which she failed to do. See Haskell v. Verysyss Liquidating Trust, 75 Mass.App.Ct. 120, 127 (2009) (“one relying on a condition to avoid a contractual obligation has the burden to prove the occurrence of the condition”). Moreover, while the lease was not placed in evidence, so it is not known whether the Corporation was the lessee and the parties were guarantors, or the lease was directly with the parties, or there was some other arrangement, at worst it would be Ghassemi who would have a continuing contingent liability on the lease notwithstanding his sale of his interest in the Corporation, if the landlord did not agree to an assignment.
The December 4th letter’s reference to the execution of a purchase and sale agreement does not preclude the enforceability of the contract formed by the parties’ letters of offer and acceptance. See Coan v. Holbrook, 327 Mass. 221, 224 (1951), quoting from Restatement of Contracts §26 (1932) (“Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof...”). “Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties.” Lafayette Place Assocs. v. Boston Redev. Authy., 427 Mass. 509, 518 n.9 (1998), quoting from Teachers Ins. Annuity Assn. v. Tribune Co., 670 F.Sup. 491, 497-98 (S.D.N.Y 1987) (Leval, J.).
Here, the parties fully understood the nature of their practice; they had been practicing together for at least sixteen years. The December 4th letter did not recite any particularly thorny issues to be resolved in a purchase and sale agreement or that any particular item needed to be further negotiated. As there was no statement in either letter that time was of the essence, the parties could be expected to work reasonably diligently to close the sale. While covenants sufficient to protect the business interests that Hami was buying would be expected in the purchase and sale agreement, in fact, Hami and Ghassemi had different practices (he was an orthodontist, and she a pediatric dentist) and there is no indication that Ghassemi would not agree to a reasonable geographic restraint on his right to set up another orthodontic practice, if indeed he still wanted to practice.[4], [5] Indeed, this is not a case in which attempts to negotiate a purchase and sale agreement foundered. Rather, as Hami testified, on further reflection she simply changed her mind about her acceptance of the offer to *526 purchase. This was not a right that she reserved in her unconditional letter of acceptance.
Harm's Counterclaims
As noted in the introduction, Hami has asserted five counterclaims against Ghassemi. Without dwelling on the specific theory of recovery asserted by Hami in each of her counts, she claims that Ghassemi’s acts of placing his wife on the Corporation’s payroll and making payments to himself of amounts in excess of the equal profit sharing formula to which the parties agreed gave rise to causes of action they she could assert directly against Ghassemi. Ghassemi argues that all of these claims belong to the Corporation and should have been asserted derivatively, if at all. The court notes that in a case that has been pending for four years, the day of trial is an inappropriate time to first raise the direct versus derivative issue. While the court might well find that the injury allegedly suffered in this case is actually direct to Hami— the Corporation was always able to pay all of its obligations and the effect of Ghassemi’s payments to himself was to deprive Hami of her right to receive fifty percent of these sums — under the circumstances of this case, the court need not wrestle with that issue. As the court will enforce Hami’s obligation to purchase Ghassemi’s shares, it has no problem finding that Ghassemi has an obligation to pay to the Corporation any sums which he wrongfully paid to himself or caused to be paid to his wife. Since it is undisputed that Hami and her attorney knew about the contested payments when the buy/sell offer was made, Ghassemi might argue that those claims were taken into account in the proposed buy/sell price set out in the October 15th letter. However, notwithstanding that argument, the court cannot make the release of these claims a part of the parties’ deal without creating a judicially imposed contract term not spelled out in the offer or acceptance. Such a term would not be a standard term in a purchase and sale agreement for shares in a dental practice professional coiporation.[6]
Turning to the claims themselves, the court finds that neither Hami, nor the Corporation, has a claim relating to Mrs. Ghassemi’s wages. Hami had the undisputed power to direct Practical Payroll not to issue a check to Mrs. Ghassemi, if she objected to Mrs. Ghassemi’s employment or the amount of her wages. Other than with respect to the paid vacation issue, she approved each check issued to Mrs. Ghassemi. Her actions in approving these payments for a period of years manifested her assent to the employment and the rate of pay.
On the other hand, Ghassemi had no right to make payments to himself of funds other than pursuant to the equal profit sharing agreement to which the parties agreed and which had governed their relationship for years. His testimony that he was evening the score because of the “FICA payments” made to Hami years before is no justification. The two checks from the Commonwealth for MassHealth insured services to his patients ($8,392 and $5,380); the 2006 payment to his wife of $726.91 to cover the paid vacation that Hami rejected, and the 2007 payment to himself of $5,000, are all sums by which Ghassemi was unjustly enriched and which he caused to be paid in violation of his fiduciary duties to the Corporation and Hami and must be repaid to the Corporation.
ORDER
For the foregoing reasons, the Court orders that final judgment enter as follows;
On the complaint, final judgment shall enter declaring that the October 15, 2007 and December 4, 2007 letters constitute a binding agreement pursuant to which Hami is obligated to purchase Ghassemi’s interest in the Corporation for $400,000. The purchase shall be completed as of December 31, 2012. The parties are directed to agree upon the terms of a standard purchase and sale agreement for the shares in a dental practice. If they fail to do so, the court will appoint a master to prepare the agreement, the master’s fees to be paid by the Corporation.
On the counterclaims, final judgment shall enter under counts II and v. in favor of the Corporation in the amount of $19,498.91 plus interest at the statutory rate of 12% from the date the counterclaim was filed. That sum to be deducted from the amount due Ghassemi at the closing of the purchase of his shares by Hami.
The counterclaim to the counterclaim is dismissed with prejudice.[7]

 There was no evidence offered as to whether either of the parties or the Corporation acquired the practice, and the manner of its acquisition plays no part in this decision.

 By the time of the April meeting, Hami was aware that Ghassemi had made the tíxree payments to himself discussed above.

 Hami testified that she authorized her attorney to send this letter.

 In fact, the December 4th letter Invited Ghassemi or his daughter to provide orthodontic services to Hami’s offices after the sale on mutually agreeable terms, although acceptance of this proposal was not made a condition to the agreement to purchase Ghassemi’s interests.

 While the purchase and sale agreement needed to sell an interest in a dentistry practice may not be as standardized as that used for the purchase of real estate (see McCarthy v.Tobin, supra), Hami did not call her attorney or any other expert to testify concerning material terms beyond the purchase price that would need to be resolved through negotiation. Moreover, since this was the sale of an interest in a professional practice of health care providers, Ghassemi’s continuing obligations to his patients would to a large extent be fixed by norms and the ethical rules of his profession, and he would continue to be liable for any injury caused by his own malpractice. See G.L.c. 156A, §6.

 Ghassemi might argue that he should receive a credit for fifty percent of these payments, as he would have received that sum if he had not made them and the amounts were distributed as profit. It was, however, Ghassemi that argued that these claims belonged to the Corporation not Hami. The court finds that the claims are an asset of the Corporation.

 No evidence in support of this claim was offered by Ghassemi at trial.