NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-851                                    Appeals Court

 K & K DEVELOPMENT, INC.  vs.  ZACHARY ANDREWS, individually and
                          as trustee.[1]


                        No. 22-P-851.

       Essex.     May 10, 2023. – September 15, 2023.

          Present:  Meade, Blake, & Brennan, JJ.


Rules of the Superior Court.  Practice, Civil, Findings by
     judge.  Agency, Scope of authority or employment.  Real
     Property, Sale, Purchase and sale agreement, Specific
     performance.  Contract, Sale of real estate, What
     constitutes, Offer and acceptance, Performance and breach,
     Specific performance, Damages.  Frauds, Statute of.
     Electronic Mail.  Damages, Loss of profits.


     Civil action commenced in the Superior Court Department on
January 19, 2018.

     The case was heard by James F. Lang, J.


     Gordon N. Schultz for the defendant.
     Paul Alan Rufo (Vincent N. DePalo also present) for the
plaintiff.


     BLAKE, J.  The plaintiff, K & K Development, Inc. (K&K or

buyer), brought this action against the defendant Zachary

     [1] Of ZEA 1 Realty Trust.

Andrews, individually and as trustee of ZEA 1 Realty Trust (ZEA1 or seller), alleging that ZEA1 committed a breach of its agreement to sell two mixed-use rental properties to K&K. After a bench trial in the Superior Court, conducted pursuant to Rule 20 of the Rules of the Superior Court (2018) (rule 20), the judge answered special questions on the elements of each claim. He concluded that a valid agreement existed between the parties, ZEA1 committed a breach of that agreement, and, as a result, K&K was entitled to specific performance and monetary damages based on lost profits.

On appeal, ZEA1 challenges the sufficiency of the evidence demonstrating the existence of a binding contract and a breach thereof, K&K's entitlement to both specific performance and damages, and the denial of ZEA1's motion in limine to exclude evidence of a deposit made by K&K to bind the purported agreement. We affirm in all respects except for one minor adjustment to the damages calculation.

Background. "We recite the facts that the judge could have found, . . . reserving some for later discussion." Spinosa v. Tufts, 98 Mass. App. Ct. 1, 3 (2020). Because the judge's answers to the special questions turn in large part on the communications between the parties, our review requires us to set forth the facts in some detail, all of which are drawn from the trial record. See Wendy's Old Fashioned Hamburgers of N.Y.,

Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 375 & n.3
(2009).

1. The properties. Brothers Zachary and Eugene Andrews
own and manage several commercial and residential properties.[2]
In 1999, they purchased two adjoining buildings located on Union
and Chestnut Streets in Lynn as investment properties
(properties). In 2001, they transferred the titles to the
properties to ZEA1, a realty trust of which Zachary is the
trustee and Zachary and Eugene each are fifty percent
beneficiaries.

The properties consist of eight commercial units on the
ground level and twelve residential units on the second and
third floors. In 2015, a fire resulted in significant damage to
one of the buildings causing it to close (damaged building).
Shortly thereafter, the brothers listed the properties for sale,
with Eugene acting as the licensed broker for the listing.
Because they did not receive any offers within their desired
price range, the brothers decided to demolish the interior and
renovate the damaged building before relisting the properties
for sale.

2. K&K's offers to purchase. K&K is a corporation that
acquires and develops real estate. Boris Kuritnik, K&K's

---

[2] Because the Andrews brothers share a last name, we refer
to them hereafter by their first names.

treasurer, secretary, and director, works with Hakim Sadler, a licensed real estate salesperson, to identify real estate opportunities, and to acquire and sell properties.

Sadler came across the original listing for the properties and brought it to Kuritnik's attention in 2016. From March 2017 to November 2017, K&K made five unsuccessful offers to purchase the properties.[3] During that time, Sadler and Eugene communicated about the properties, including the status of the certificates of occupancy for the damaged building in order for the premises to be leased.

After the fifth unsuccessful offer, Kuritnik and Sadler completed a walk-through of the properties.[4] On November 2, 2017, Kuritnik, on behalf of K&K, executed a new offer to purchase (November 2 offer). The November 2 offer included a purchase price of $2.683 million with a $5,000 deposit to bind the offer and an additional $95,000 deposit to be paid on the execution of the purchase and sale agreement (P&S).[5] Like the earlier offers, the November 2 offer was submitted on a

---

[3] The unsuccessful offers included three in March 2017, when the damaged building still required major work, and two in October and November 2017 as that work neared completion.

[4] Kuritnik and Sadler previously conducted a walk-through of the properties in March 2017.

[5] The deposit was nonrefundable on K&K's receipt of clear title.

preprinted form issued by the Greater Boston Real Estate Board (GBREB) that included a "[t]ime is of the essence" provision, stated that the offer was "a legal document that creates binding obligations," and advised the parties to consult an attorney if they needed further advice. K&K also incorporated in the offer and affixed to it a contingency page signed by Kuritnik with six additional terms, including, as relevant here, that the "Buyer [is] granted the right to market and negotiate all new tenancy upon acceptance" (original rental provision). Kuritnik included the original rental provision based on his understanding at the time that the building unaffected by the fire was occupied, and the damaged (now renovated) building would be vacant when sold.

ZEA1 asked some follow-up questions about the November 2 offer but did not accept it by the deadline of November 29, 2017. However, Sadler and Eugene continued to communicate throughout November about the potential sale. At Eugene's request, Eugene and Sadler spoke by telephone on November 29 about the framework for the sale and ZEA1's concerns about the November 2 offer. Later that day, Eugene returned the November 2 offer to Sadler with revisions (November 29 counteroffer). On the offer form, Zachary changed the expiration date of the offer to noon on November 29, 2017, the date to execute the P&S to December 15, 2017, and the date to close to February 18, 2018. On the addendum, Zachary crossed out the original rental

provision, and he added in a new provision that the "Seller will rent and collect income from units until closing." Zachary initialed his changes to the dates and signed both the form and the addendum. Eugene signed in the section indicating receipt of a $5,000 deposit from K&K to be held in escrow by Sadler's employer.

On November 30, 2017, at 12:30 P.M. (after the November 29 counteroffer had expired by its terms), Eugene sent a text message to Sadler as follows: "Hakim did you get our counteroffer yesterday? If so could I get some feed back [sic]. We have good applicants ready to move in asap. I liked [sic] to [k]now what to tell them." Sadler and Eugene then spoke by telephone about rental pricing for potential tenants. Around 3 P.M. that same day, Sadler followed up via e-mail message in response to the November 29 counteroffer, explaining about the leases:

> "The buyer is fine with the pricing but wants to be clear on the provision below:
>
> "'Buyer shall have the final approval of all tenant(s) and lease(s) prior to leasing the units for both commercial and residential [(new rental provision)]. Buyer[']s sole and exclusive approval shall control. All approvals shall be in writing in advance.
>
> "All store fronts to be finished with uniform materials including but not limited to windows, type of glass, doors etc. [(storefront provision)].'

"Based on the above verbiage, we might as well start forwarding the buyer the rental applications you have collected from potential tenants thus far. Thoughts?"

By that time, Kuritnik understood that ZEA1 intended to lease the damaged building and collect rent until the closing. Based on that understanding, Kuritnik explained to Sadler that he sought the right to approve the leases (rather than the ability to market and execute leases as requested in the original rental provision) to "limit [K&K's] exposure to bad tenants on the residential side and control the lease price and terms . . . on the commercial."

Approximately one hour later, Eugene responded via e-mail message, "Hakim one of the doors is not bronze metal. But it will be painted to match. Also tomorrow is the first so can they review applications tomorrow?" About twenty minutes later, Sadler sent to Eugene the November 29 counteroffer with the following revisions. Kuritnik changed the date on the top of the offer form from November 2 to November 30, and initialed next to Zachary's prior changes to the dates for acceptance of the offer, execution of the P&S, and closing. A new addendum was affixed to the offer that included the five terms left unaltered by the parties in the prior contingency page as well as the new rental provision and the storefront provision referenced in Sadler's e-mail message to Eugene. That version

of the addendum was signed by Kuritnik, but it was never signed by Zachary or Eugene (November 30 addendum).[6]

On December 4, 2017, Sadler informed Eugene that the $5,000 deposit was in escrow and arranged to pick up the rental applications. On the same day, Sadler met with Eugene to obtain the rental applications. After Kuritnik reviewed the applications, Sadler informed Eugene that K&K agreed to all five tenants and requested "discretion moving forward regarding any new, potential leases." ZEA1 then executed at least two residential leases on December 4.

On December 4 and 7, 2017, Sadler also requested contact information for ZEA1's attorney from Eugene in order to move forward with the P&S. On December 7, Eugene responded that no P&S would be forthcoming as "[t]he counteroffer with changed terms was not acceptable to seller and was not executed by the seller."

3. Present action. In January 2018, K&K brought this action for declaratory relief, specific performance, and breach of contract. Following a four-day bench trial conducted pursuant to rule 20, the judge explained that he intended to answer the questions on the special verdict form in the parties'

_____

[6] Although the addendum sent by K&K is dated November 29, 2017, we refer to it as the November 30 addendum because it appears that the addendum was sent from K&K to ZEA1 on November 30.

presence and "to provide a very truncated explanation for my reasoning."[7]

At a subsequent hearing, the judge announced his verdict. In response to the special questions, he found that there was a valid contract for the sale of the properties, K&K substantially performed its obligation under that contract, ZEA1 committed a breach of the contract, and K&K was entitled to specific performance and $483,705 in damages for lost profits. The judge also made "remarks" about the evidence, but warned that they were not intended as factual findings and "hardly compare[d]" to the type of detailed findings he would make in the absence of a rule 20 waiver.[8] Judgment subsequently entered in favor of K&K

---

[7] Prior to trial, K&K filed a motion for sanctions based on ZEA1's purported noncompliance with discovery. The judge permitted testimony regarding ZEA1's compliance with discovery, noting that the issue might bear on credibility. He also noted that he might "draw one or more of the requested adverse inferences if they [were] warranted based on [his] consideration of such evidence." Ultimately the judge did not draw any negative inferences.

[8] The judge commented that K&K's addition of the new rental provision in the November 30 addendum was material, but was the product of a discussion between Sadler and Eugene that the provision was acceptable to ZEA1. The judge further noted that even if Sadler and Eugene did not discuss the new rental provision, the parties both operated as if that provision was accepted and in full force based on the evidence that Eugene provided Sadler with five rental applications on December 4, Sadler communicated K&K's approval of those tenants, and ZEA1 immediately drafted leases for execution on two applications after receiving that approval. With respect to any dispute over the scope of the storefront provision, the judge explained that the provision became a "nonissue" after Sadler and Eugene agreed

ordering specific performance and awarding damages for lost profits. This appeal followed.

Discussion. 1. Enforceable agreement. ZEA1 challenges the sufficiency of the evidence to demonstrate the existence of a binding agreement, and that if such agreement exists, enforcement is barred by the Statute of Frauds.

a. Standard of review. K&K contends that ZEA1's challenge to the sufficiency of the evidence is waived because ZEA1 did not renew its motion for a directed verdict at the close of its case. This argument is misplaced as it is premised on a jury trial; in that circumstance, a motion for a directed verdict at the close of all evidence generally is required to preserve a sufficiency challenge. See Beverly v. Bass River Golf Mgt., Inc., 92 Mass. App. Ct. 595, 600 (2018). That requirement does not extend to the circumstances here, as "[m]otions for directed verdicts are proper only when a jury have been empanelled." Kendall v. Selvaggio, 413 Mass. 619, 620 n.3 (1992). To the extent that K&K suggests that ZEA1 was required to move for directed or required findings, see M.G. v. G.A., 94 Mass. App Ct. 139, 139 n.1 (2018), or for involuntary dismissal, see Kendall, supra, to preserve its sufficiency challenge, we disagree given the procedure agreed on by the parties.

_____

that ZEA1 would paint the one unmatching door in the damaged building, the cost of which was negligible.

Pursuant to rule 20(2)(h), the parties waived their right to a jury trial and to "detailed written findings of fact and rulings of law." The parties agreed to waive any arguments that required or depended on detailed factual findings. Accordingly, appellate review is conducted according to the same standard as that applied to a judgment entered following a jury verdict. See Rule 20(8)(b) of the Rules of the Superior Court (2018). Cf. Spinosa, 98 Mass. App. Ct. at 10 (parties did not waive challenge to damages award despite waiver of detailed factual findings).

Consistent with the parties' agreement, and in compliance with rule 20(8)(a), the judge "answer[ed] special questions on the elements of each claim, at a level of detail comparable to a special jury verdict form pursuant to Mass. R. Civ. P. 49 (a)[, 365 Mass. 812 (1974)]." We therefore review to determine "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the [prevailing party].'" Motsis v. Ming's Supermkt., Inc., 96 Mass. App. Ct. 371, 380 (2019), quoting Dobos v. Driscoll, 404 Mass. 634, 656, cert. denied, 493 U.S. 850 (1989).[9]

---

[9] Although the judge made "remarks" as he answered the special questions, he was not required to do so under rule 20, and we are not bound by them. See Rule 20(8)(b) of the Rules of the Superior Court (2018).

b.  Evidence of a contract.  "[T]o create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement."  Situation Mgt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). "[A]n agreement may be enforceable that anticipates a more formal writing, but in such a case, the parties must have agreed upon either the material terms, or upon the 'formulae and procedures' that will provide the material terms at some future date."  Frishman v. Maginn, 75 Mass. App. Ct. 103, 110-111 (2009).  "Ordinarily the question whether a contract has been made is one of fact" (citation omitted).  Coldwell Banker/Hunneman v. Shostack, 62 Mass. App. Ct. 635, 640 (2004).

Here, the judge could have found that the parties reached a binding contract either because the terms altered by K&K's November 30 addendum were not material or because ZEA1 accepted those new terms.

i.  November 29 counteroffer.  On the issue of materiality, the terms of K&K's November 30 addendum differed from ZEA1's November 29 counteroffer in three respects:  the provision that the seller would lease and collect rent through closing was omitted, the new rental provision was added, and the storefront provision was added.  An express term that the seller would lease and collect rents through closing was not necessary as it

merely memorialized the status quo (and K&K already was aware that ZEA1 intended to lease the building prior to the closing). With respect to the new rental provision, Kuritnik testified that the term was not essential, and K&K sought only to be involved in the rental process as a courtesy that was typically extended to a buyer.[10] While ZEA1 presented evidence that giving K&K approval rights over leases was material to the seller, other evidence established that the leasing process was largely complete in December 2017 and, therefore, K&K's approval rights would have been limited.[11] Finally, Kuritnik testified that he did not view the storefront provision as essential or significant, and the term required only painting one door at minimal cost. If credited by the judge, this evidence was sufficient to demonstrate that any differences between the November 29 counteroffer and the November 30 addendum concerned nonmaterial aspects of the parties' agreement, including the specifics of ZEA1's leasing of the damaged building within the agreed on price range. See Goren v. Royal Invs. Inc., 25 Mass. App. Ct. 137, 141 (1987) (binding preliminary agreement existed

---

[10] Sadler also testified that the November 30 addendum provided a framework for the P&S and included "a lot of trivial smaller fine points."

[11] Nine of the ten residential units and four of the six commercial units in the damaged building were either rented or in the process of being rented in December 2017.

even where subsequent bargaining in anticipation of purchase and sale agreement over "subsidiary matters [where] norms exist for their customary resolution").

The judge also could have found that the November 29 counteroffer memorialized all material terms of the parties' agreement. See McCarthy v. Tobin, 429 Mass. 84, 85 (1999) (offer to purchase enforceable that specified "price to be paid, deposit requirements, limited title requirements, and the time and place for closing"). Evidence of K&K's acceptance of those terms included Sadler's confirmation to Eugene after receiving the November 29 counteroffer that the deal was moving forward and Kuritnik's initials next to the material changes (i.e., the P&S and closing dates) on the form.[12] See Restatement (Second) of Contracts § 59 comment a (1981) ("definite and seasonable expression of acceptance is operative despite the statement of additional or different terms if the acceptance is not made to depend on assent to the additional or different terms").

---

[12] The judge also could have found that ZEA1 waived the "time is of the essence" provision because Eugene followed up about the November 29 counteroffer the day after it expired by its own terms, and provided K&K with the rental applications after learning that the deposit was delivered on December 4, rather than contemporaneously with the formation of the agreement. See McCarthy, 429 Mass. at 89 (provision may be waived through words and conduct; once waived, "time was no longer of the essence").

ii.  November 30 addendum.  Even if the changes in the November 30 addendum were material, the judge could find that the terms were accepted by Eugene's November 30 e-mail message to Sadler explaining that the one door would be painted to match, and that Sadler could pick up the rental applications.

To the extent ZEA1 argues that Eugene lacked the authority to accept any terms of the agreement on its behalf, we are not persuaded.  The evidence was that Eugene, as ZEA1's agent,[13] had actual authority to enter into a binding agreement on ZEA1's behalf (either because Eugene had decision-making authority or because Zachary agreed to the changed terms).[14]  See Baldwin's Steel Erection Co. v. Champy Constr. Co., 353 Mass. 711, 715 (1968) ("The authority of an agent is a question of fact, the answer to which depends upon the inferences to be drawn from a variety of circumstances" [citation and quotation omitted]).

---

[13] ZEA1 does not dispute that Eugene was acting as its agent and broker.  Instead, ZEA1 focuses on the scope of Eugene's authority because "[a] real estate agent . . . is not an agent of general powers.  As a rule he has no authority to bind his principal beyond the terms of the specific authority conferred upon him by the agreement for employment."  Harrigan v. Dodge, 216 Mass. 461, 463 (1914).

[14] "Actual authority can be express or implied.  Actual authority results when the principal explicitly manifests consent, either through words or conduct, that the agent should act on behalf of the principal.  Implied authority is actual authority that evolves by implication from the conduct of the parties."  (Citations omitted.)  Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 743 n.13 (2000).

Zachary maintained that he had the final word on decision-making, but the judge was not required to accept that evidence, see Weiler v. PortfolioScope, Inc., 469 Mass. 75, 81 (2014) ("credibility of the witnesses rests within the purview of the trial judge"); rather he could find that Eugene had broader authority to finalize the transaction where he operated a long-standing business with his brother, handled all the property sales for that business, was charged with discussing this sale and all others on behalf of ZEA1, and was a fifty percent beneficiary of ZEA1. See Baldwin's Steel Erection Co., supra (sufficient evidence that general manager had authority to enter into binding contract on behalf of company notwithstanding statement that sister's signature was required on agreement).

The judge also could have found that Zachary expressly agreed to the terms in the November 30 addendum as the brothers spoke daily about business and Eugene continued to engage with K&K in early December as if an agreement had been reached.[15]

iii. Intent to be bound. As to the parties' intent to be bound, the preprinted form that they used stated that it was a legal document intended to creating binding obligations; Zachary

_____

[15] Given Eugene's communications with Sadler through early December, the judge could have rejected the testimony that the terms of the November 30 addendum were unacceptable to Zachary and that Eugene was under "strict instructions" from Zachary to stop all negotiations with K&K as of November 30.

testified that he understood that provision when signing the November 29 counteroffer. The parties' conduct following the exchange of the November 29 counteroffer and the November 30 addendum also was indicative of an intent to be bound. K&K delivered a deposit to be held in escrow and so notified ZEA1. Thereafter, Eugene provided Sadler with rental applications for K&K's approval and agreed to paint one of the doors. After K&K approved the applications, ZEA1 executed at least two of the leases. See Hunneman Real Estate Corp. v. Norwood Realty, Inc., 54 Mass. App. Ct. 416, 423 n.11 (2002), quoting 1 Corbin, Contracts § 2.9, at 154 (rev. ed. 1993) ("The subsequent conduct and interpretation of the parties themselves may be decisive of the question as to whether a contract has been made, even though a document was contemplated and has never been executed").[16] See

---

[16] ZEA1 also argues that any agreement reached was illegal because G. L. c. 112, § 87RR, required Sadler, a licensed salesperson, to obtain approval from the real estate broker for whom he worked before negotiating or completing any transaction or agreement. ZEA1 failed to raise the affirmative defense of illegality in the Superior Court. See Mass. R. Civ. P. 8 (c), 365 Mass. 749 (1974). In these circumstances, we see no reason to depart from the general rule that "a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case" (citation omitted). Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991). To the extent ZEA1 argues that we should consider a defense of illegality, even though not pleaded, when "the evidence 'shows a contract which is inherently wrongful or which is violative of some fundamental principle of public policy,'" we are unpersuaded that exception applies here. O'Donnell v. Bane, 385 Mass. 114, 117 (1982), quoting Gleason v. Mann, 312 Mass. 420, 422 (1942). The record does not demonstrate an agreement that

also <u>McCarthy</u>, 429 Mass. at 85, 87-88 (execution of purchase and sale agreement not necessary to bind parties; offer to purchase on preprinted GBREB form enforceable); <u>Goren</u>, 25 Mass. App. Ct. at 139, 141 (offer to purchase binding even where mutually acceptable purchase and sale agreement contemplated by offer not executed by both parties).  But see <u>Walsh</u> v. <u>Morrissey</u>, 63 Mass. App. Ct. 916, 916 (2005) (offer to purchase not binding contract where parties had differing interpretation of provisions, material terms "were left too vague," and offer explicitly contemplated subsequent P&S agreement).

c.  <u>Statute of Frauds</u>.  ZEA1 contends that the enforcement of any agreement is barred by the Statute of Frauds because the November 30 addendum was not signed by Zachary.  "As a black letter rule, the Statute of Frauds bars suit '[u]pon a contract for the sale of lands . . . or of any interest in or concerning them . . . [u]nless the promise, contract or agreement . . . is in writing and signed by the party to be charged therewith.'" <u>Hurtubise</u> v. <u>McPherson</u>, 80 Mass. App. Ct. 186, 188 (2011), quoting G. L. c. 259, § 1.  To satisfy the Statute of Frauds, a writing (or multiple writings when read together) "must contain

---

is either wrongful or violative of public policy; it reflects only silence on the issue whether the real estate broker employing Sadler "approve[d] the negotiation and completion by [Sadler] . . . of [the] agreement." G. L. c. 112, § 87RR.  We cannot fault K&K for failing to present such evidence absent notice that ZEA1 intended to raise an illegality defense.

directly, or by implication, all of the essential terms of the parties' agreement." Simon v. Simon, 35 Mass. App. Ct. 705, 709 (1994). See Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 600 (2007) (multiple writings read together can satisfy Statute of Frauds). "Whether a writing satisfies the Statute of Frauds is a question of law." Simon, supra.

If the November 29 counteroffer outlined all the material terms of the agreement, the Statute of Frauds is easily satisfied based on the written offer signed by both parties. If the November 30 addendum also included material terms, the Statute of Frauds is satisfied by reading the November 29 counteroffer together with the November 30 e-mail message exchange between Sadler and Eugene.

The issue whether an e-mail message can satisfy the Statute of Frauds has not been squarely addressed by our case law. However, we have previously acknowledged that a legally binding contract may be formed through the exchange of e-mail messages. See Fecteau Benefits Group, Inc. v. Knox, 72 Mass. App. Ct. 204, 212 (2008); Basis Tech. Corp. v. Amazon.com, Inc., 71 Mass. App. Ct. 29, 44-45 (2008). The Legislature expressly established the legal effect of electronic records and signatures through the enactment of G. L. c. 110G, § 7, which provides:

"(<u>a</u>) A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.

"(<u>b</u>) A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation.

"(<u>c</u>) If a law requires a record to be in writing, an electronic record satisfies the law.

"(<u>d</u>) If a law requires a signature, an electronic signature satisfies the law."

This statute reflects the realities of how business is often conducted in today's marketplace.[17]  Cf. <u>Goldstein</u> v. <u>Secretary of the Commonwealth</u>, 484 Mass. 516, 534 (2020) (Kafker, J., concurring) ("Electronic signatures are the norm in the private sector and many areas of government").

On this record, we conclude that the e-mail message exchange constitutes an electronic record within the meaning of G. L. c. 110G, § 2,[18] and, thus, has the legal effect of satisfying the "writing" requirement of the Statute of Frauds. G. L. c. 259, § 1.  The messages were generated following significant negotiations and included one message from Eugene with the signed November 29 counteroffer attached, Sadler's

---

[17] The judge could find that the parties agreed to "conduct transactions by electronic means," given their history of negotiating terms and presenting offers via e-mail and text messages.  G. L. c. 110G, § 5 (<u>b</u>).

[18] General Laws c. 110G, § 2, defines an "[e]lectronic record" as "a record created, generated, sent, communicated, received, or stored by electronic means."

response thereto about the new rental and the storefront provisions, and Eugene's acceptance of those provisions with clarification. See G. L. c. 110G, § 9 (b) ("The effect of an electronic record or electronic signature . . . is determined from the context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties' agreement, if any, and otherwise as provided by law"). The e-mail messages also bear the necessary electronic signatures as they originated from Eugene's e-mail account, his signature appears in the exchange, and he acknowledged at trial that he sent the messages.[19] See G. L. c. 110G, § 9 (a) ("electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner . . ."). See also Michelson v. Sherman, 310 Mass. 774, 775-776 (1942) (signature of authorized agent satisfies Statute of Frauds).[20] Accordingly, the requirements of the Statute of Frauds are satisfied.[21]

---

[19] General Laws c. 110G, § 2, defines an "[e]lectronic signature" as "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with intent to sign the record."

[20] The judge could have found that Eugene had actual authority to bind ZEA1.

[21] To be sure, the transmission of an e-mail message from the sender's account, without more, does not necessarily bind the author in a legally cognizable way. As was the case here,

2.  Remedies.  a.  Entitlement to damages.  ZEA1 claims that K&K's recovery must be limited to specific performance and not monetary damages.[22]  In Perroncello v. Donahue, 448 Mass. 199, 205 (2007), the Supreme Judicial Court concluded that the seller of real property was entitled to both specific performance of the contract and additional damages (i.e., carrying costs) that he incurred as a result of the delay between the expected closing date and the actual date of conveyance.  The court explained that "[t]his award is not inconsistent with specific performance," id., citing in support the proposition that "[a] party who seeks specific performance . . . may . . . be entitled to damages to compensate him for delay in performance."  Id. at 205-206, quoting Restatement (Second) of Contracts § 378 comment d (1981).  See Motsis, 96 Mass. App. Ct. at 378-379 (lessor required to perform lease obligations and pay damages caused by previous failure to do so and for any period of delay in completing specific performance).  Accordingly, we discern no error in the award of lost profit damages for the period postdating the agreed on closing date.

---

the totality of the circumstances must support a conclusion that the sender intended to be so bound.

[22] ZEA1 relies on the doctrine of anticipatory repudiation in support of its argument.  Because that argument was not raised in the Superior Court, it is waived.

b.  Calculation of damages.  ZEA1 next maintains that it is entitled to certain monetary adjustments to the specific performance order based on carrying costs and expenses it paid after the agreed upon closing date that increased the properties' value.  Our review of the damages award is highly deferential.  See Spinosa, 98 Mass. App. Ct. at 10.  "[T]o overturn such an award, we would have to determine that it was 'clearly excessive in relation to what the plaintiff's evidence ha[d] demonstrated damages to be'" (citation omitted).  Id.

K&K suggested a sound method to calculate lost profit damages, namely, to reach the appropriate amount by determining ZEA1's net operating income (i.e., rental income generated by the properties, minus ZEA1's expenses) and then subtracting K&K's anticipated carrying costs had the agreed on deal been finalized.  K&K amply supported its calculations by introducing ZEA1's Federal tax returns for 2018 through 2021, and providing testimony about the mortgage that K&K anticipated obtaining to finance the purchase of the properties.  There was no error in the utilization of this procedure.

However, in considering the evidence presented, there was a slight computational error.[23]  The judge awarded $483,705 in

---

[23] The judge could have found that in the forty-six month period from March 2018 through December 2021, ZEA1's net operating income was $665,764, and K&K would have paid $258,412 in interest on its anticipated mortgage.  In total, this equates

damages.  That amount appears to be based on a failure to adjust the 2018 figures to account for the fact that the closing was not set to occur until February 18, 2018.  K&K acknowledged that lost profit damages should not include the months of January and February 2018, but failed to make the requisite adjustment in the total amounts presented to the judge.[24]  Accordingly, ZEA1 is entitled to a reduction in the lost profit damages award to reflect the correct amount of $460,482.[25]

---

to lost profits of $407,352 for the period from March 2018 to December 2021.  To calculate the remaining lost profits from January 2022 through trial in June 2022, we discern no error in the judge's acceptance of K&K's suggestion that a reasonable monthly amount could be arrived at by using the average monthly damages from the preceding forty-six month period.  That amount is $8,855 per month or $53,130 for the six-month period.  The evidence then supports a total lost profit damages award of $460,482.

[24] K&K presented evidence that ZEA1's net operating income was $123,244 for 2018; $218,749 for 2019; $164,639 for 2020; and $179,673 for 2021.  K&K also presented evidence that ZEA1's net operating income for 2018, as adjusted to reflect the relevant ten-month period after the closing date, was $102,703.  In its closing argument, K&K argued that ZEA1's net operating income was $686,305, for the period from March 2018 to December 2021.  Accounting for the two-month adjustment, that amount should have been $665,764.

[25] We are unpersuaded by ZEA1's remaining argument that it was entitled to further deductions for carrying costs and expenses it incurred.  The net operating income amount did include deductions derived from the tax returns for costs associated with cleaning and maintenance, insurance, taxes, utilities, water and sewer, trash collection, and plowing.  The damages amount also reflected adjustments for K&K's anticipated mortgage interest payments.  To the extent that ZEA1 sought further deductions, it was required to raise that argument in the first instance before the judge, and we discern no abuse of

3.  Deposit evidence.  Finally, ZEA1 argues that the judge abused his discretion in declining to exclude all evidence of K&K's $5,000 deposit because a copy of the check was not produced during discovery.

ZEA1 points to 254 Code Mass. Regs. § 3.00(10)(b) (2005), which requires a broker (here, Sadler's employer) to keep a record of the deposit check held in escrow for a three-year period.  ZEA1 seemingly suggests, based on the regulation (cited for the first time on appeal) and the nonproduction of the check, that the judge should have inferred that the deposit was never made and allowed ZEA1's motion in limine.  We are not persuaded.  Even in the absence of documentary evidence establishing the existence of K&K's check, the judge was free to admit and credit Sadler's testimony that he received the check at his office as sufficient evidence that the deposit was made.  Accordingly, the judge did not abuse his discretion.[26]  See Laramie v. Philip Morris USA Inc., 488 Mass. 399, 414 (2021) (evidentiary decisions reviewed for abuse of discretion).

---

discretion in the judge's failure to consider the issue sua sponte.  Cf. Flynn v. Wallace, 359 Mass. 711, 720 (1971) (judge has discretion to invoke unjust enrichment doctrine if specific performance ordered "following reasonable conflicting viewpoints on the law and facts").

[26] Because we discern no abuse of discretion, we need not decide whether the motion sufficiently preserved this issue for appeal.  See Commonwealth v. Grady, 474 Mass. 715, 719 (2016).

Conclusion.  So much of the judgment as awarded lost profit damages to K&K in the amount of $483,705 is vacated, and a new judgment shall enter awarding lost profit damages to K&K in the amount of $460,482.  As so modified, the judgment is affirmed.[27]

So ordered.

---

[27] K&K's request for appellate attorney's fees and costs is denied.