SUPERIOR COURT 
 
 MCR LABS, LLC vs. ANALYTICS LABS, LLC & Others[1]

 
 Docket:
 2584CV00260-BLS2
 
 
 Dates:
 October 21, 2025
 
 
 Present:
 Debra A. Squires-Lee
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS’ MOTIONS TO DISMISS
 
 

             MCR Labs, LLC (MCR), an analytical laboratory that provides testing services to companies that cultivate, market, and sell cannabis products in Massachusetts, filed suit against eight of its competitors (together Defendants) alleging that each artificially inflates the THC potency of their customers’ cannabis products and / or manipulates test results to eliminate evidence of contaminants such as yeast, mold, lead, and pesticides in the cannabis products.
            Due to the above alleged conduct, MCR alleges that cannabis cultivators engage in lab shopping, meaning cultivators discern which labs provide the most favorable results, both with respect to THC potency and contaminants, and engage those labs for testing. MCR also alleges that Defendants’ wrongful conduct harms consumers who
 
--------------------------------------------
 
[1] Assured Testing Laboratories, LLC; CDX Analytics, LLC; Green Analytics Massachusetts, LLC / f/k/a Steep Hill Massachusetts; Green Valley Analytics, LLC; Kaycha MA, LLC; Massbiolytics Corp.; and Safetiva Labs, LLC. 
CDX Analytics LLC (CDX) has not been served with the Summons and Complaint in this case and the Clerk is kindly directed to dismiss CDX without prejudice pursuant to Mass. R. Civ. P 4(j). Accordingly, I do not include herein factual allegations specific to
 
                                                            -1-
 
purchase cannabis products that are falsely labelled and potentially unsafe. MCR asserts three claims: violation of G. L. c. 93A, § 11 (Count I); Tortious Interference with Business Relations (Count II); and Unjust Enrichment (Count III).
            Before me are five motions to dismiss (Motions) brought by: (i) Analytics Labs, LLC (Analytics), Green Valley Analytics, LLC (Green Valley), and SafeTiva Labs, LLC (SafeTiva); (ii) Assured Testing Laboratories, LLC (Assured); (iii) Green Analytics Massachusetts LLC (Green Analytics); (iv) Kaycha MA, LLC (Kaycha); and (v) Massbiolytics Corp. (Massbiolytics) (together, Motions). Each Motion seeks dismissal for failure to state a claim pursuant to Mass. R. Civ. P. 12(b)(6).  The Motion of Analytics, Green Valley, and SafeTiva also seeks dismissal for improper venue pursuant to Mass. R. Civ. P. 12(b)(3). After hearing and review, and for the reasons below, the Motions are Allowed-in-part and Denied-in-part.
BACKGROUND
            I recite the relevant facts asserted in the Complaint, “taking them as true for purposes of evaluating the motion to dismiss.” Edwards v. Commonwealth, 477 Mass. 254, 255 (2017). I do not accept as true conclusory allegations or legal conclusions. See Iannacchino v. Ford Motor Co., 451 Mass. 623, 632-633 (2008). Much of the Complaint recites the statutes and regulations governing recreational cannabis in the Commonwealth and I do not include all the governing law below. Rather, I have summarized the law and regulations as applied to independent testing laboratories, like the parties before me. Further, the Complaint contains several available charts and figures, and references to recent press coverage of cannabis testing companies.  I include the factual averments MCR draws from those sources. Some facts are reserved for discussion below.
 
                                                            -2-
 
            I. Background of Cannabis Testing in the Commonwealth
            The Commonwealth legalized the recreational use of marijuana in 2016 with sales beginning in 2018. The Commonwealth imposes strict testing and labeling requirements for cannabis products to ensure safety and allow consumers to make informed decisions. The Cannabis Control Commission (CCC) promulgates regulations relating to recreational cannabis products and licenses independent testing laboratories. The CCC requires that all cannabis products be tested by an independent testing laboratory, including for THC potency and the presence of mold, mildew, heavy metals, pesticides, and other contaminants.
            Cannabis products must include labels indicating the products’ “Total THC Potency” and a statement and seal certifying that the product has been tested for contaminants, the date of the test, and that there were no adverse findings. Massachusetts forbids false or misleading labeling of cannabis products. “Total THC Potency” refers to the “concentration of chemical compounds responsible for most of marijuana’s psychoactive effects.” Total THC Potency is comprised mostly of “THC and THCa, and an inflation of either compound in a test result would . . . inflate the tested product’s Total THC Potency.”[2] Further, cannabis products that contain mold, yeast, or other contaminants over a certain threshold may not be sold to the public.
            MCR and each Defendant is an independent testing laboratory approved and licensed by the CCC and required to comply with the testing protocols contained in statute and imposed by CCC regulations. Agricultural testing service laboratories
 
--------------------------------------------
 
[2] THCa is “Tetrahydrocannabinolic acid . . . the acid precursor of Delta-9 Tetrahydrocannabinol (Delta-9 THC).” THCa is nonintoxicating but is “converted to intoxicating Delta-9 THC through the process of decarboxylation (heating up to a critical temperature between 200-290 degrees Fahrenheit).” Cannabis Regulatory Agency Answers Recent Questions Regarding THCA, located at www.michigan.gov>media>cra>bulletin (Last visited Oct. 9, 2025).
 
                                                            -3-
 
follow accepted and reliable scientific methodologies such that results “will be consistently similar when testing the same sample” and customers can expect largely similar results from different certified laboratories.
            II.  Defendants’ Alleged Wrongful Conduct
                        A. Reporting Elevated THC Potency Levels
            Cannabis consumers demand higher THC potency levels and THC potency is a key factor in purchasing and pricing decisions for cannabis users. High potency cannabis, which is defined as containing 21-28 percent THC, can be sold at more than two times the price per gram of low potency cannabis products, defined as containing 7-14 percent THC. Thus, products that are falsely labeled and contain inflated THC Potency levels can command a higher price and consumer preference. As noted, one way to manipulate Total THC Potency is to manipulate the reported levels of THCa.
            Analytics THCa Testing. One cultivator, TO1,[3] used MCR for testing from July 2021 to April 2022. The average THCa level from MCR’s test of 578 samples was 19.20 percent. TO1 switched to Analytics in April 2022. The average THCa level from Analytics’ testing of 998 samples rose 8.4 percentage points to 27.59 percent.
            Assured THCa Testing. In 2024, Assured’s average THCa test results were 14.5 percent higher than the Massachusetts average. Between January 2022 to January 2024, MCR tested cannabis products for cultivator TO2. The average THCa level for the 170 samples tested by MCR was 23.72 percent. TO2 switched to Assured after January 2024, and the average level for the 33 samples tested by Assured rose to 28.62 percent.
            Green Analytics THCa Testing. MCR tested TO3’s cannabis products from January 2023 to August 2023. The average THCa level for the 1,011 samples MCR
 
--------------------------------------------
 
[3] The Complaint includes allegations relating to several unidentified cultivators identified for THC testing purposes as TO1 to TO6 and, for contaminant testing, as MO1 to MO7.
                                                            -4-
 
tested was 24.2 percent. TO3 switched to Green Analytics and the average THCa level for the 344 samples Green Analytics tested rose to 27.79 percent.
            Green Valley THCa Testing. In the first quarter of 2024, Green Valley was the lab that reported 36 of the 37 cannabis samples statewide with THCa levels of over 40 percent. From July 2023 to January 2024 MCR tested TO4’s cannabis samples. The average THCa level for the 238 samples MCR tested was 22.29 percent. When Green Valley began testing TO4’s samples, the average THCa level of the 153 samples Green Valley tested rose to 32.61 percent.
            Kaycha THCa Testing. From June 2022 to March 2023, MCR tested TO5’s cannabis samples. The average THCa level for the 650 samples MCR tested was 23.02 percent. When Kaycha began testing TO5’s samples, the average level of the 820 samples Kaycha tested rose to 27.03 percent.
            SafeTiva THCa Testing. From July 2021 to November 2021, a nonparty lab tested TO6’s cannabis samples. The average THCa level for 146 samples tested by that lab was 19.61 percent. TO6 switched to Analytics and the average THCa level from 322 samples tested by Analytics rose to 27.24 percent. TO6 switched again to SafeTiva and the average THCa level of the 130 samples SafeTiva tested rose to 30.45 percent.
            MCR alleges that the above detailed increases in THCa levels cannot be achieved without result manipulation.
                        B. Falsely Reporting Lower Levels of Contaminants
            Massachusetts independent testing labs must also test for the presence of contaminants. CCC regulations specify the maximum allowable contaminant amounts above which products cannot be sold to the public – ten thousand colony forming units of yeast or mold per gram or 104 cfu/g. Those labs that do not “fail” samples receive more business from cannabis cultivators. “From April 2021 through 2023, labs in Massachusetts that failed fewer tests than in the previous year tested a median of 84%
 
                                                            -5-
 
or samples during the next 12 months.” “In Massachusetts, over 50% of cannabis sourced from retailers and retested failed the limit for mold.”
            Analytics Contaminant Testing. MO2 used MCR from December 2021 to March 2022 and the failure rate based on the presence of contaminants was 19 percent. After MO2 switched to Analytics, the rate dropped to zero. MCR alleges that “[t]his drastic reduction of mold failures cannot be explained by anything other than result manipulation.” MCR includes in its Complaint a chart showing the distribution of all results of total yeast and mold in samples tested by Analytics. Analytics’ results dropped off steeply at the 104 cfu/g legal limit.
            Assured Contaminant Testing. MCR tested MO3’s cannabis samples in 2023 with a 16.4 percent failure rate. When MO3 switched to Assured, the failure rate dropped to zero. In the second quarter of 2024, Assured reported the presence of mold in only four of the thousands of samples it tested and reported. In the first two quarters, Assured did not fail a single sample for yeast or mold.
            Green Analytics Contaminant Testing. MCR tested MO4’s samples for contaminants from January 2023 to August 2023 with a failure rate of 23.3 percent. When Green Analytics assumed the testing function for MO4, the failure rate dropped to zero. Green Analytics test results also show a steep drop right at the 104 cfu/g legal limit. Green Analytics also tests cannabis in Maryland, which MCR alleges has a more robust compliance program than Massachusetts, and its average failure rate in Maryland was 20 percent compared to 2.1 percent in the Commonwealth.
            Kaycha Contaminant Testing. MCR tested MO5’s samples for contaminants from February 2022 to March 2023 with a failure rate of 31.6 percent. When Kaycha assumed the testing function for MO5, the failure rate dropped to 2 percent. Kaycha’s test results also show a steep drop right at the 104 cfu/g legal limit. Kaycha’s failure rate also varies by state. In Nevada, which has a more robust compliance program and
 
                                                            -6-
 
routinely fines or orders labs to close when the labs are found to manipulating data/results, the failure rate of samples tested by Kaycha is over 11 percent – four times greater than the failure rate in Massachusetts.
            SafeTiva Contaminant Testing. A nonparty lab tested MO6’s samples for contaminants from August 2022 to April 2023 with a failure rate of 18.7 percent. When SafeTiva assumed the testing function for MO6, the failure rate dropped to 4.8 percent. SafeTiva’s failure rate in the first half of 2024 was under 2.1 percent with a zero percent failure rate in the second quarter of 2024, which is much lower than the industry average. SafeTiva’s test results also show a steep drop right at the 104 cfu/g legal limit.
            Massbiolytics Contaminant Testing. MCR tested MO7’s samples for contaminants in February 2022 with a failure rate of 66.7 percent. When Massbiolytics assumed the testing function for MO7, the failure rate dropped to zero. Massbiolytics’ test results also show a steep drop right at the 104 cfu/g legal limit.
            MCR alleges that the above detailed reductions and elimination of mold failure rates cannot be achieved without result manipulation. According to the CCC Chief of Research: “We realized that there was a huge issue with the data and how labs are reporting total yeast and mold [and] [d]ata from some labs showed a massive number of samples fell just below the state’s threshold for contaminants like mold . . . while virtually none were above the threshold, a near impossibility statistically.”
            C. Additional Alleged Wrongful Conduct
            Defendants participated in “round robins” in which customers sent representative samples of cannabis products to multiple labs and the lab which generated the highest THC potency level and lowest fail rates (meaning lowest levels of contaminants) would win the customer’s business. Defendants’ artificial inflation of THC potency and suppression of contamination detection thus lured customers away from laboratories not manipulating testing results like MCR.
 
                                                            -7-
 
            In April 2024, the CCC issued an Order and Stipulated Agreement with Holistic Industries, Inc. (Holistic), a Massachusetts cannabis cultivator. Between September and November 2021, the CCC received complaints regarding mold contamination at Holistic’s facility, including from employees, that contaminated product was pushed through. The CCC also received a letter from the Monson Board of health requesting an inspection due to mold complaints. In 2021, the CCC issued a Notice of Deficiency and received Holistic’s mold remediation plan. Holistic was MCR’s client. “When [MCR] refused to pass its samples for mold contamination, Holistic [] ceased working with [MCR] and began to utilize Green Analytics. In 2021 and 2022, Green Analytics tested 385 of Holistic’s products with a failure rate of 4.4 percent whereas MCR had tested 161 samples with a failure rate of 62.7 percent.
            Pursuant to the Stipulated Agreement with the CCC, Holistic was required to use the CCC’s contracted laboratory for six months. That lab tested 112 Holistic samples with a failure rate of 58.9 percent and, during some of the same period, Green Analytics tested 112 samples with a 4 percent failure rate.
            III.  MCR’s Harm
            MCR was founded in 2013 to advance public health and safety through leading edge chemical analysis of cannabis products. MCR was successful and expanded to over one hundred employees in a large laboratory. MCR’s business has been severely impacted by lab shopping and MCR’s existing and potential customers have been drawn to labs that provide higher but inaccurate THC levels and ignore safety failures.
DISCUSSION
            In evaluating a motion brought under Mass. R. Civ. P. 12(b)(6), I “look beyond the conclusory allegations in the complaint,” Curtis v. Herb Chambers I-95 Inc., 458 Mass. 674, 676 (2011), and determine if the plaintiff has pleaded “factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief.” Iannacchino,
 
                                                            -8-
 
451 Mass. at 636 (quotations omitted). In doing so, I must accept as true all facts pleaded in the complaint. Edwards, 477 Mass. at 255. I also accept as true “such inferences as may be drawn [from those facts] in the plaintiff’s favor.” Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). I address each of MCR’s claims in turn.[4]
            I. G. L. c. 93A, § 11
            General Laws c. 93A, § 2 makes unlawful two types of conduct “unfair methods of competition” and “unfair or deceptive acts or practices in the conduct of any trade or commerce[.]” G. L. c. 93A, § 2(a). Chapter 93A, § 11 “applies these prohibitions to dealings between those ‘engaged in trade or commerce,’ giving a private right of action to businesses harmed by another business’s unlawful conduct under § 2.” H1 Lincoln, Inc. v. S. Washington St., LLC, 489 Mass. 1, 14 (2022). There is no dispute that MCR and each of the Defendants is engaged in trade or commerce – each provides laboratory testing services to cannabis cultivators in the Commonwealth. MCR is therefore an appropriate G. L. c. 93A, § 11 plaintiff and each defendant is an appropriate chapter 93A defendant.
            Defendants argue first that MCR has not alleged facts that plausibly suggest they violated chapter 93A, § 2. I disagree. MCR has alleged that each Defendant improperly inflated the THCa levels of the products it tested and / or improperly deflated their contamination levels. By that conduct, Defendants facilitated false advertising and inflated sales prices for products with a lower Total THC Potency level than disclosed and / or enabled the sale of unsafe and potentially dangerous cannabis products to the public. Defendants are alleged to have done so for their own profit, namely, to lure and
--------------------------------------------
 
[4] Not all Defendants make the same arguments. I address all those necessary to decide the instant Motions. Any arguments left unaddressed were unpersuasive and / or based on non-binding and non-persuasive caselaw.
 
                                                            -9-
 
persuade cannabis cultivators to use their services, because cultivators were incented to retain those labs that had the lowest contamination fail rates and the highest THCa levels. Put succinctly, to increase their market share, Defendants are alleged to have violated regulations put in place to protect cannabis consumers and thereby facilitated the false advertising of THC potency levels and enabled the sale of cannabis products with illegal (and arguably dangerous) levels of mold.[5]
            If proved, such conduct – cheating on state regulated laboratory tests to increase market share – certainly could constitute “unfair methods of competition.” G. L. c. 93A, § 2(a). Further, MCR has alleged – and as is reasonably inferable – that it has been harmed by such conduct through the loss of cultivator customers due to Defendants’ alleged wrongdoing.
            Defendants argue next that the claim must be dismissed because MCR was not engaged in a business relationship with any of the Defendants. It is true that myriad cases require a commercial relationship between the parties to support a G. L c. 93A, § 11 claim. See Rafferty v. Merck & Co., 479 Mass. 141, 162 n.7 (2018) (“Unlike claims under § 9, claims under § 11 require not only that the defendant’s conduct occur in ‘trade or commerce’ but also that there be a commercial transaction between the
 
--------------------------------------------
 
[5] I disagree that the facts as alleged are too conclusory on which to base a 93A, § 11 claim. MCR has alleged significant statistical differences between the results of MCR’s testing for THCa and contaminants and the defendants’ results for specific unidentified but identifiable cannabis cultivators. MCR has also alleged, as a matter of fact, that such divergence could only be caused by Defendants intentionally falsifying results. Such allegations, together with the reasonable inferences that I must draw, plausibly suggest unfair trade practices leading to unfair competition. See Golchin v. Liberty Mut. Ins. Co., 460 Mass. 222, 223 (2011). Defendants’ challenges to those facts, namely, that there are plausible reasons why the test results would so diverge, is for a later date on a fully developed factual record. MCR also does not improperly “lump” the Defendants together but details factual allegations relating to each with respect to identifiable cannabis cultivators.
 
                                                            -10-
 
parties.”); Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 563 (2008) (“As a threshold matter, analysis of the applicability of G.L. c. 93A, § 11, requires a dual inquiry whether there was a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a ‘business context.’”); Szalla v. Locke, 421 Mass. 448, 451-452 (1995) (“[Chapter] 93A requires that there be a commercial transaction between a person engaged in trade or commerce with another person engaged in trade or commerce.”).
            MCR responds, however, that the limitation identified in those cases concern only § 11 claims based on “unfair or deceptive acts or practices in the conduct of any trade or commerce” and not § 11 claims premised on allegations of “unfair methods of competition[.]” I agree.
            As to disputes arising “in a business context” under § 11, the requirement that a plaintiff alleging unfair or deceptive acts or practices be engaged in a “commercial transaction” with the defendant serves to, inter alia, ensure that “strictly private transaction[s],” Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 23 n.33 (1997), and “purely intra-enterprise disputes fall outside the reach of G. L. c. 93A, § 11.” Governo L. Firm LLC v. Bergeron, 487 Mass. 188, 194 (2021). See Linkage Corp., 425 Mass. at 23 (1997) (“Included in this ‘intra-enterprise’ classification are disputes stemming from an employment relationship, disputes between individual members of a partnership arising from partnership business, and transactions and disputes between parties to a joint venture and between fellow shareholders.” (citing cases)). However, in requiring a commercial transaction between plaintiff and defendant to circumscribe the reach of a § 11 unfair and deceptive practices claim, courts have not held such privity is required to assert a claim of unfair competition. See Governo L. Firm, 487 Mass. at 194 & n.14 (noting plaintiff could pursue claims for theft of trade secrets against parties with whom plaintiff was not engaged in commercial transaction) citing Augat, Inc. v.
 
                                                            -11-
 
Aegis, Inc., 409 Mass. 165, 172 (1991); Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass. App. Ct. 937, 939 (1984). Indeed, none of the cases that Defendants rely upon involved claims of unfair competition, as Plaintiff has alleged here. See Rafferty, Milliken & Co. and Szalla, supra.
            A recent unpublished decision from a panel of the Appeals Court is illustrative. In FlightLevel Norwood, LLC v. Boston Exec. Helicopters LLC, 105 Mass. App. Ct. 1114, 2025 WL 471187 (Feb. 12, 2025) (Rule 23.0) review denied, 495 Mass. 1109 (2025), the parties were sublessees of adjoining parcels of land at Norwood Memorial Airport. The plaintiff was a fixed-base operator (FBO) and the defendant wished to become an FBO. Id. at *1. The plaintiff alleged (and proved) that the defendant engaged in an ongoing course of wrongful conduct of interfering with the plaintiff’s leasehold interest for the purpose of achieving the defendant’s commercial aim of becoming an FBO. Id. at *2. The Appeals Court noted that, “[a]lthough [the plaintiff’s] amended complaint asserted claims under both prongs of § 2 (a), [the plaintiff] waived the unfair competition theory at trial, presumably for strategic reasons.” Id. Thus, the Appeals Court reversed the judgment for the plaintiff on its G. L. c. 93A, § 11 claim because the parties were not engaged in a business relationship as between themselves, holding “[w]e agree with the defendants that when the theory of c. 93A liability is unfair and deceptive acts and practices, those acts must occur within the parties’ business relationship.” Id. (emphasis added). Accord Stop & Shop Supermarket Co. v. Loomer, 65 Mass. App. Ct. 169, 174-175 (2005) (“[W]e note that this case does not concern an unfair method of competition between two competing business entities. Rather, we deal with that branch of the statute that prohibits the use or employment of an unfair or deceptive act or practice … . Liability under that branch of G.L. c. 93A, § 11, ‘requires that there be a commercial transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce.’” (emphasis added)), quoting Szalla, 421 Mass. at 451.
 
                                                            -12-
 
            Requiring that a plaintiff’s claim for unfair and deceptive practices under G. L. c. 93A, § 11 arise from a commercial transaction with the defendant ensures that not every tort between employers and employees, business partners, or two business entities rises to the level of a c. 93A claim, with the attendant prospect of multiple damages. It likewise prohibits business entities from acting as roving attorneys general bringing suit to police (and interfere with) their competitors’ commercial transactions with third parties. But that is not what MCR has done. MCR alleges that Defendants’ wrongful conduct was directed at the market of labs providing testing for cannabis cultivators and that the wrongful conduct harmed their competitor, MCR, which followed the law and regulations.
            Section 11 provides a private right of action to “[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money” from “an unfair method of competition.” The plain meaning of “competition” is that the entities are rivals, not parties to a transaction with one another. See COMPETITION, Merriam Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/ competition (Last visited Oct. 20, 2025) ( “(1) [a] rivalry: such as . . . the effort of two or more parties acting independently to secure the business of a third party by offering the most favorable terms . . . (2) a contest between rivals”). To require MCR to be in privity with Defendants to assert an unfair competition claim would thus defy the plain meaning of the statute. Further, if a business entity in an industry which can establish a “loss of money or property” from the unfair methods of competition of its competitor could not bring suit under § 11 absent a commercial transaction with the competitor, then chapter 93A, § 2’s prohibition on unfair methods of competition would be toothless or, at best, a caged tiger reliant on the government to pursue claims under § 4. That cannot be so. Not when our courts recognize G. L. c. 93A as “a statute of broad impact,” Governo L. Firm, 487 Mass. at 195, quoting Slaney v. Westwood Auto, Inc., 366
 
                                                            -13-
 
Mass. 688, 693 (1975), and G. L. c. 93A, § 11 explicitly grants a cause of action to “[a]ny person who engages in . . . trade or commerce” who suffers economic damages as a result of “an unfair method of competition.” Section 11, with its weighty deterrent provisions of punitive damages and attorneys’ fees must be available to market competitors to stop unfair competition and recover for the harm they suffered. To conclude otherwise would grossly undermine the purposes of c. 93A and defy the plain import of its terms.
                        Defendants do not effectively grapple with that argument. They argue that the alleged facts do not allege unfair methods of competition because there was no consumer confusion.[6] Defendants misapprehend the scope of Chapter 93A. The creation of consumer confusion can be one method of unfair competition, it is not the only method. Indeed, the federal case on which several Defendants rely, Katin v. National Real Est. Info. Servs., Inc., No. CIV. A. 07-10882DPW, 2009 WL 929554 (D. Mass. Mar. 31, 2009), ultimately held that “plaintiffs' allegations that defendants adversely affected their competitive position in the market for conveyancing services by engaging in the unauthorized practice of law may constitute an ‘unfair method of competition’ within the meaning of [c.] 93A.” Id. at *10 (emphasis added). Here as
 
--------------------------------------------
 
[6] They also argue that the Complaint does not allege unfair methods of competition because it recites specific conduct which Defendants engaged in and uses the phrase “unfair or deceptive acts or practice.” That argument is specious. First, unfair competition stems from specific conduct. And here, the conduct alleged – falsifying data – constitutes the means and methods of Defendants’ unfair competition. Moreover, to the extent MCR alleged the conduct constituted “unfair and deceptive acts and practices” the facts alleged, read in their entirety, state a claim of unfair competition. Rather than dismissal, MCR will be permitted to amend its Complaint. As a general principle, our courts do not “submit to a tyranny or labels”; “[t]he label attached to a pleading … [or to certain factual allegations] is far less important than [the] substance.” Colorio v. Marx, 72 Mass. App. Ct. 382, 385 (2008).
 
                                                            -14-
 
well, MCR’s allegations that Defendants’ falsified laboratory test results in violation of Massachusetts regulations which adversely affected MCR’s competitive position in the marketplace for cannabis testing services may constitute an “unfair method of competition” proscribed by c. 93A. It thus makes no difference to MCR’s right to sue that the cannabis cultivators went along with Defendants’ alleged fraudulent conduct for their own anticompetitive reasons.[7]
            Finally, Defendants argue that, because the 93A claim is premised on fraudulent conduct, the claim fails because MCR has not satisfied Mass. R. Civ. P. 9(b) and articulated the circumstances of fraud with “particularity.” “While Mass. R. Civ. P. 9(b) requires specification of circumstances in averments of fraud, mistake, duress or undue influence, the concept of unfair or deceptive acts or practices made actionable by G. L. c. 93A goes far beyond the scope of the common law action for fraud and deceit, and does not necessarily require similar pleading specificity.” U.S. Funding, Inc. of Am. v. Bank of Boston Corp., 28 Mass. App. Ct. 404, 407 (1990) (quotations omitted). Accord Impact Tech. Licensing, LLC v. Barry-wehmiller Companies, Inc., No. 2484CV03350-BLS2, 2025 WL 1006454, at *18 (Mass. Super. Mar. 7, 2025) (Salinger, J.).
 
--------------------------------------------
 
[7] Defendants point to Hunneman Real Est. Corp. v. Norwood Realty, Inc., 54 Mass. App. Ct. 416, 429 (2002). That case, however, did not involve a claim of unfair competition. Rather, the c. 93A aspect of the case concerned allegations that the plaintiff’s competitors induced a real estate brokerage business to break its agreement with the plaintiff – a classic unfair trade practices claim that must arise from a commercial transaction the plaintiff and defendant. Id. As noted, Defendants’ reliance on Milliken & Co., 451 Mass. 547 and Governo L. Firm, 487 Mass. 188 are also unavailing. In Milliken & Co., the Supreme Judicial Court held that because the conduct at issue occurred in the course of a bankruptcy proceeding, it did not occur in a “business context.” 451 Mass. at 564. In Governo L. Firm, the SJC explicitly held that while the absence of a commercial transaction precluded intra-enterprise claims (employer-employee), the defendants could still be held liable under c. 93A, § 11 for theft and (mis)use of trade secrets – i.e., unfair methods of competition. 487 Mass. at 194.
 
                                                            -15-
 
            For all the above reasons, the motions to dismiss MCR’s G. L. c. 93A, § 11 claim are denied.
            II. Tortious Interference with Business Relationships
            Defendants fare better on their motions to dismiss the claim of tortious interference with business relations. The elements of this claim are well established and well known. “[T]o make out a claim for interference with advantageous business relations, the plaintiff must prove that (1) he had a business relationship for economic benefit with a third party, (2) the defendants knew of the relationship, (3) the defendants interfered with the relationship through improper motive or means, and (4) the plaintiff's loss of advantage resulted directly from the defendants' conduct.” Kurker v. Hill, 44 Mass. App. Ct. 184, 191 (1998).
            Although MCR identifies at least one specific cannabis cultivator that used both its lab services and the services of one of the Defendants, it does not allege facts that suggest that Defendants knew the cultivator was using MCR and that Defendants lured those specific customers away from MCR based on the false testing they would offer the customer.
            To the contrary, the overall gist of the Complaint is that cannabis cultivators in the Massachusetts’ market learned about those labs that reported higher THCa levels and lower contamination failure rates and themselves migrated to use those laboratories in lieu of MCR. Intentional interference requires more than unfair competition that results in a competitive advantage. It requires intentional conduct directed as a specific customer. In other words, each Defendant must have had knowledge of the contract or the relationship with which it is alleged to have interfered. See Bourque v. Cape Southport Assocs., LLC, 60 Mass. App. Ct. 271, 277–78 (2004) (defendant must have “knowledge of the contract or business relationship”), citing
 
                                                            -16-
 
Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 397 (1996). Facts in support of that element are nowhere alleged and the motions to dismiss Count II must be allowed.
            III. Unjust Enrichment
            Under Massachusetts law, “[u]njust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience. ” Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005) (quotations omitted). “An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law.” Id. “A plaintiff must show that (1) he or she conferred a measurable benefit on the defendant, (2) he or she reasonably expected compensation from the defendant, and (3) the defendant accepted the benefit with knowledge of the plaintiff's reasonable expectation.” Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 589 (2024), citing Stewart Title Guar. Co. v. Kelly, 97 Mass. App. Ct. 325, 335 (2020).
            Here, MCR bases its unjust enrichment claim on the assertion that Defendants obtained ill-gotten gains from their wrongful manipulation of testing data to the detriment of MCR, which was complying with all of its lawful and scientific obligations. But MCR did not and has not conferred a benefit on Defendants merely because it complied with the law. One’s compliance with the law is required regardless of whether others comply with the law and such compliance does not confer any benefit on wrongdoers. The scenario posited here – Defendants gained market share by unfair methods of competition – simply does not state a claim of unjust enrichment.  Any other conclusion would open the floodgates of unjust enrichment claims. Nor has MCR opposed the motion to dismiss its unjust enrichment claim.
            The motions to dismiss the unjust enrichment claim, for all the above reasons, must be allowed.
            IV. Doctrine of Primary Jurisdiction
 
                                                            -17-
 
            Because the CCC has promulgated extensive regulations governing marijuana testing in the Commonwealth,[8] Assured argues the claims must be dismissed based on the doctrine of primary jurisdiction. That doctrine was recently and cogently explained by the Appeals Court in Malden Police Patrolman’s Ass’n v. Malden, 92 Mass. App. Ct. 53 (2017):
The doctrine of primary jurisdiction . . . is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. It arises in cases where a plaintiff, in the absence of pending administrative proceedings, invokes the original jurisdiction of a court to decide the merits of a controversy that includes an issue within the special competence of an agency. The primary jurisdiction doctrine allows a judge to delay or deny judicial review in favor of administrative proceedings when an action raises a question of the validity of an agency practice, . . . or when the issue in litigation involves technical questions of fact uniquely within the expertise and experience of an agency.
Id. at 58 (citations and quotations omitted).
            “If an agency has the regulatory power to afford a plaintiff relief, exhaustion of the possibility of remedial agency action should ordinarily precede independent action in the courts.” Columbia Chiropractic Grp., Inc. v. Trust Ins. Co., 430 Mass. 60, 62 (1999), citing Nelson v. Blue Shield of Mass., Inc., 377 Mass. 746, 752 (1979). “Primary jurisdiction is, however, a doctrine exercised in the discretion of the court.” Id.
            Here, the doctrine is inapplicable principally because the CCC has no power to afford MCR relief. Even if the CCC were immediately to act concerning each Defendant and investigate and determine whether it has been falsifying data, the CCC has no power to make MCR whole for its lost market share caused by the alleged wrongful
 
--------------------------------------------
 
[8] The CCC regulations specify testing requirements, authorize consumer complaints about testing, authorize the CCC to inspect laboratories, obtain testing records, issue administrative holds, and issue cease and desist letters, and provides an administrative review process. See 935 Code Mass. Regs §§ 500.160; 500.300-303; 500.310; 500.320-321; 500. 350; 500.370; 500.500.
 
                                                            -18-
 
conduct. See Columbia Chiropractic, 430 Mass. at 62 (claim that c. 93A could not be “advanced directly in a court of law based on a violation of a regulatory agency’s regulations lacks merit” particularly where agency could not grant such relief). Further, in presiding over MCR’s c. 93A claim, this Court will not be required to enforce CCC regulations. It will determine whether, by intentionally violating CCC regulations to gain market share, Defendants engaged in unfair competition which harmed MCR. The doctrine of primary jurisdiction does not apply, and I would not exercise my discretion to apply it in these circumstances regardless.
            Assured’s motion to dismiss on the doctrine of primary jurisdiction is denied.
            V. Venue
            Finally, Analytics, Green Valley, and SafeTiva move to dismiss the Complaint against them for lack of venue.9 Analytics and Green Valley are located in Holyoke, Hampden County. SafeTiva is located in Leverett, Franklin County. Venue is appropriate “in any county in which either corporation has a usual place of business, or in which it held its last annual meeting, or usually holds its meetings.” G. L. c. 223, § 8(2). MCR does not allege that these three defendants have a usual place or business or has held an annual meeting in Suffolk County. Thus, venue is not appropriate in Suffolk County. That the case was brought in the Business Litigation Session does not confer venue in Suffolk County. Superior Court Administrative Directive No. 24-1: Superior Court Business Litigation Sessions (“The filing of a complaint in Suffolk County and its acceptance into the BLS does not prevent any party from moving to dismiss or transfer the case for improper venue.”)
            However, if Analytics, Green Valley, and SafeTiva’s motion to dismiss for lack of venue were allowed, the practical effect would be to transfer the case against Analytics
 
--------------------------------------------
 
[9] The other defendants, having failed to raise a venue issue, have waived it.
 
                                                            -19-
 
and Green Valley to Hampden County and the case against SafeTiva to Franklin County. See G. L. c. 223, § 15 (“If an error in venue is discovered . . . the court may, upon motion of either party, order the action, with all papers relating thereto, to be removed to the proper county upon terms to the defendant; and it shall thereupon be entered and prosecuted in the same court for that county as if it had been originally commenced therein, and all prior proceedings otherwise regularly taken shall be valid.”)
            MCR responds that, were I to order transfer, it would promptly move to consolidate those cases here with this case. See Mass. R. Civ. P. 42(a) (“When actions involving a common question of law or fact are pending before the court, in the same county or different counties, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.” (emphasis added).
            I discern no reason why I cannot circumvent the costs, expense, delay, and waste of judicial and clerk resources engendered by a transfer to two different counties, only to allow a motion to consolidate and have the cases transferred back to the BLS. Analytics’, Green Valley’s, and SafeTiva’s “position is entirely contrary to the spirit of the rules of civil procedure and is untenable.” O'Connor v. City Manager of Medford, 7 Mass. App. Ct. 615, 619 (1979). The waste of resources and time is not a just result.
            Accordingly, the motion to dismiss for lack of venue is denied without prejudice pending a motion by MCR to consolidate its G. L. c. 93A, § 11 claim against Analytics, Green Valley, and SafeTiva with its claim against the other Defendants in the BLS. Should MCR fail to do so within thirty days, Analytics, Green Valley, and SafeTiva may renew their motion for transfer to Hampden and Franklin Counties.
 
                                                            -20-
 
ORDER
            For the foregoing reasons:
            The Motion to Dismiss of Defendants, Analytics Labs, LLC, Green Valley Analytics, LLC, and SafeTiva Labs, LLC (Dkt. No 25) is ALLOWED as to Counts II and III and DENIED as to Count I. The Motion to Dismiss pursuant to Mass. R. Civ. P. 12(b)(3) is DENIED-WITHOUT-PREJUDICE to renewal as indicated above.
            Defendant Assured Testing Laboratories, LLC’s Motion to Dismiss (Dkt. No. 33); Defendant Green Analytics Massachusetts, LLC’s Motion to Dismiss (Dkt. No. 38); Kaycha MA, LLC’s Motion to Dismiss Plaintiff’s Complaint Pursuant to Rule 12(b)(6) and Rule 9(b) (Dkt No. 44); and Defendant Massbiolytics Corp.’s Motion to Dismiss Plaintiff’s Complaint (Dkt. No 51) are ALLOWED as to Counts II and III and DENIED as to Count I.
            Plaintiff shall file an Amended Complaint consistent with the above, i.e. making clear it proceeds pursuant to G. L. c. 93A, §11 for damages based on Defendants’ unfair methods of competition within thirty days.
/s/Debra Squires-Lee
Debra A. Squires-Lee
Justice of the Superior Court
October 21, 2025